(Nos. 38859-38904.—

THE PEOPLE *ex rel.* George Musso, County Collector, Appellee, *vs.* CHICAGO, BURLINGTON & QUINCY RAILROAD Co. *et al.,* Appellants.

*Opinion filed June 24, 1965.—Rehearing denied Sept. 27, 1965.*

BURROUGHS, SIMPSON AND BURROUGHS, of Edwardsville, and R. T. CUBBAGE, T. G. SCHUSTER, and JOHN H. BISHOP, all of Chicago, (ELDON MARTIN and C. W. KROHL, of counsel,) for appellant Chicago, Burlington & Quincy Railroad Company.

HUGH J. DOBBS, of Springfield, T. G. SCHUSTER, of Chicago, and JAMES R. PARHAM, of East St. Louis. (JAMES N. OGDEN, LOUIS F. GILLESPIE, ELDON MARTIN, JORDAN JAY HILLMAN, GEORGE M. HOLLANDER, GILLESPIE, BURKE & GILLESPIE, POPE & DRIEMEYER, PETER HERZOG, COBURN, CROFT & KOHN, WAYNE P. WILLIAMS, WALKER & WILLIAMS, JOHN F. MCCARTHNEY, GORDON BURROUGHS, ROBERT E. EGGMANN, ROBERTS, GUNDLACH, LEE & STUBBS, JOHN F. SCHLAFLY, and SCHLAFLY, GODFREY & FITZGERALD, of counsel,) for other appellants.

JOSEPH R. BARTYLAK, State's Attorney, of Edwardsvile, and BURTON C. BERNARD, Assistant State's Attorney, of Granite City, (DICK H. MUDGE, JR., of counsel,) for appellee.

Mr. JUSTICE HOUSE delivered the opinion of the court:

Twelve railroads filed objections to taxes levied against their operating properties in Madison County for the years 1957 to 1962 inclusive, and seek a return of that portion of the taxes paid under protest. They contend that their Illinois property was assessed at full value while the equalized value of locally assessed property did not exceed 55% of full fair cash value in any of the tax years involved, and that the discrimination is so gross that it is constructively fraudulent against them.

The objections were consolidated for hearing by the circuit court of Madison County. It found that locally assessed property, after equalization, had been assessed at county-wide levels from 48.14% to 51.40% of fair cash (full) value, that the railroads properties were likewise undervalued at 58% to 85% of full value and that the disparities were so great as to constitute gross discrimination against objectors. The refunds ordered were not in dollar amounts but in percentages and the parties were to make the computations. The measure of refund was the difference between the railroads' taxes and the amounts they would have paid if all property in the county had been assessed at full value. The amount of each such refund was limited by (a) giving effect to any other refunds (from excess rates and the like) and (b) the amount of the protest. Jurisdiction was retained to approve or correct the computations and to "implement" the process of refund. The railroads perfected these 46 appeals directly to this court. The Collector has not appealed from the orders finding the percentage debasement of locally assessed property, nor has he cross-appealed from the findings of gross discrimination against the railroads or the orders for refund.

This is the second case in the series of railroad objection cases which have not contested the debasement of locally assessed property as disclosed by the ratio studies of the Department of Revenue. (See *People ex rel. Korzen* v. *Chicago, Burlington & Quincy Railroad Co.,* Docket No. 38942.) The only issue, therefore, is whether the railroads' properties were assessed at full, fair, cash value for the years in question. This should involve only a question of fact, to be viewed in the light of the law as developed and crystallized through a succession of these cases. While the Collector recognizes and appears to accept the principles developed in *People ex rel. Hillison* v. *Chicago, Burlington and Quincy Railroad Co.* 22 Ill.2d 88; *People ex rel. Kohorst* v. *Gulf, Mobile and Ohio Railroad Co.* 22 Ill.2d

104.; *People ex rel. Dallas* v. *Chicago, Burlington & Quincy Railroad Co.* 26 Ill.2d 292; *People ex rel. Wenzel* v. *Chicago and North Western Railway Co.* 28 Ill.2d 205; *People ex rel. Enrietta* v. *Gulf, Mobile and Ohio Railroad Co.* 29 Ill.2d 605, and earlier decisions, there is woven into the fabric of his argument in applying the law to the evidence the constantly recurring theme that the Directors of Revenue have, since 1949, sought to do equity through debasement of railroad values by the application of their judgment and thereby "hold the line" against widening the gap between State assessed railroad property and locally assessed property. Thus, while giving lip service to our approval of valuation methods (in some cases the same railroads' objections were before us for the same years here involved), the net result is an indirect attack upon those methods.

This whole argument is predicated upon the theory that in the prior cases the background evidence was insufficient to reveal the valuation methods at the State level over an extended period of time. In counsel's language: "The magnitude of the new explanatory evidence and the insight it permitted led the trial court to a consideration of several legal points which this Court was not called upon to confront in the four prior cases [*Hillison, Kohorst, Wenzel* and *Enrietta*] because of the limited records, including the presumption of constitutional compliance by the Directors."

There has been offered by the Collector much evidence by way of exhibits, some or all of which were not presented in one or more of the previous cases. For example, the ten annual reports of the Illinois Tax Commission covering the period 1933-1942 are in this record while the first five of such reports were not previously included; data sheets for all Illinois railroads from 1951 to 1963 are in evidence and in previous cases only those of the subject carrier and subject years were introduced, although expert testimony was predicated upon examination of all such

sheets. In addition, annual reports of the Department of Revenue since 1945, annual reports to stockholders of various railroads, railroad information schedules returned to the Department, United States census data, Interstate Commerce Commission reports and procedures, graphs based upon exhibits and other documents have been offered. Many of the same exhibits have been introduced by both parties. Objections have been made by the railroads that some of the literature, price indices and other materials were never admitted in evidence. A stipulation provides for the admission of evidence without a foundation being laid and is sufficiently broad to encompass almost any public document, although it contains the limitation that all were subject to objection as to relevancy, materiality or competency. There is no point in ruling on each exhibit. It is sufficient to say that out of this welter of exhibits, making a record of gargantuan proportions, we have considered only those in the record or those of which we may properly take judicial notice.

The Department of Revenue took over railroad assessment and valuation duties of the Illinois Tax Commission subsequent to the adoption of the Revenue Act of 1939. During the taxable years in question and earlier, section 80 of the act, (Ill. Rev. Stat. 1961, chap. 120, par. 561,) provided that the Department determine and assess at fair cash value the operating properties of the railroads in this State. In doing so it was to take into consideration the market value of stock, bonds and other applicable indebtedness for the preceding 5 years; the net earnings for the preceding 5 years; "and such other information as the Department may consider as bearing on the fair cash value of the property: Provided, that the facts hereinbefore named shall not be conclusive upon the Department in determining the fair cash value of the property of a railroad company." The method used by the Department under this statutory directive is explained and illustrated in *Chicago and North*

*Western Railway Co.* v. *Department of Revenue,* 6 Ill.2d 278 and *Chicago, Burlington & Quincy Railroad Co.* v. *Department of Revenue,* 17 Ill.2d 376.

Three evidences of value: capitalized earnings, market value of stock and debt, and reproduction cost less depreciation have been in use, in varying degrees, at least since 1933. The Tax Commission's report for that year, commenting upon methods used to determine system values named the following: (1) original cost plus additions less depreciation or reproduction cost less depreciation; (2) capitalization of net earnings; and (3) stock and bonds value. It went on to say, "These three methods of valuation condition and limit each other so that a fourth method, which is a composite of the above or a weighting of the various factors previously enumerated, ought to be identified. The composite method rests upon the theory that no one valuation formula is satisfactory and that true values can only be determined by a consideration of all of the elements above enumerated. * * * Primary emphasis, it is believed, should be given to earnings and stock and bond quotations in the valuation process. It is felt that these are a better reflection of the current market value of a railway than original cost." It will be noted that the formulaic result obtained by taking the average of the three valuations was not recommended. Furthermore, subsequent annual reports show conclusively that the three factors were not given equal weight. (For example, railroad valuations varied from 58% above the straight average in 1933 to 1% below such average in 1939.)

The reports of the Tax Commission for 1939-1940 again referred to the three factors, pointing out the strengths and weaknesses of each. While recognizing the desirability of a formula, the use of judgment was said to be necessary in the following language: "The development of rules of procedure for analysis of pertinent data, therefore, evidences an improving standard of administration.

Such a tendency does not necessarily imply the abandonment of all non-measurable elements of judgment and reduction of the process of arriving at an assessment to a mechanical formula. All through the process of determining an assessment the necessity for utilizing judgment arises, and in the final summary the 'tangled impressions' act directly upon the result." (The term ·"tangled impressions" refers to Mr. Justice Holmes description of the process of arriving at valuations in *Chicago, Burlington & Quincy Railroad Co.* v. *Babcock,* 204 U.S. 598, 51 L. ed. 636 where he said, "They express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions,—impressions which may lie beneath consciousness without losing their worth.")

The Commission's last reports for 1941-1942 referred to the current upswing in railroad earnings and though stating that other factors (stock and debt and reproduction cost) were considered, nothing is said to indicate the use of a fixed formula.

The 1943-1945 combined reports by the Department and those for 1945-1949 shed little light on assessment methods. The latter indicate that the 1946 and subsequent railroad assessments were made in accordance with the full value assessment legislation adopted in 1945, and state, perhaps significantly, "Departmental assessments were made and certified to the local taxing districts at full value." Counsel for the Collector concedes that there is little available documentary information of the use of a formula during the 1940's and none after the early 1940's, except for a memorandum by Lynn A. Stiles dated January 28, 1949, (which was not then admitted) but which Stiles referred to when he testified. He stated that the fomulaic approach (average of the three factors) was closely followed in the years 1943-1949. However, his recollection was that the assessments varied 5% or 10%, plus or minus, from the formula and conceded "*  *  *  but I would be

more comfortable in recollection with a ten percent spread in (sic) either side."

The historical background does not support the Collector's thesis that a straight formulaic arithmetical approach has been adopted. It shows rather that judgment, whether designated by that term or not, has always been used in the valuation process. We now proceed to examine the evidence which according to the Collector's theory, establishes a "hold the line" policy since 1949.

Harry L. Hulman became Deputy Director of the Department of Revenue in 1961 and Director in September 1963, and participated in railroad assessments in 1961 and 1962. In both years a judgment factor was applied to the formulaic result. A total railroad valuation was fixed at 1 billion 32 million dollars for 1961 and at 999-plus million dollars for 1962. The judgment factor was said to vary among the railroads to achieve those total figures, not in an effort to keep the assessments level but to determine proper assessment. For the first and only time, so far as we are aware, the phrase "hold the line" was used when Director Hulman said, "* * * and more or less arbitrarily we took the figures and tried to hold the line as close as we could to the 1960 assessment until such time as we could delve into railroad assessment further and make a study of it." He testified that he examined all of the data sheets and that no one in the Department abused their responsibility in making the 1961 and 1962 assessments. He also testified to the method of assessment he used in 1963 to implement the 1963 amendment to section 80. The amended section is the same as heretofore quoted except that the Department is now to apply an equalization factor to full value, which factor is the State-wide average ratio of assessed value of locally assessed property to the full value of locally assessed property. He stated that he used the straight formulaic average of the three factors (without application of a judgment factor) and then applied a 50%

equalization factor. This method is, of course, not in issue here, since it was used in a year subsequent to the years for which objections were filed and being heard in these proceedings.

Edward F. Koncel, who had railroad tax background, succeeded Raymond L. Danis as Supervisor of Railroad Assessments in November 1960 and worked up the rail valuation figures for 1961 and 1962. He was familiar with methods Danis used in 1959 and 1960 and he used the same methods of arriving at valuations in the two subsequent years. He testified that the assessments were at full value and in reply to a question as to whether the findings of full fair cash value by the Department debased or equalized its railroad assessments he said "no". He stated that the small reductions of railroad assessments in 1961 and 1962 were less than the decline of all three indicators of value, or any one of them.

Leo Cohen, Professor of Economics at Southern Illinois University, testified as an expert for the Collector. He recognized the possibility of corrections within each component factor, but when the three were added together and divided by three, thereby producing a straight average, he stated that judgment should not be applied. He does not say that full value was never attained but says that in his opinion the application of the judgment factor was wrong. In summary, he has his own theory of how the valuations should be obtained, which is different from that used in Illinois and approved by this court.

We have heretofore commented upon the evidence of former Railroad Assessor Stiles. Professor Rolf Weil testified in behalf of the Collector but only with respect to valuation of locally assessed property, which is not here in issue.

As pointed out by Collector's counsel the primary sources of information from 1949 to 1960 are the data sheets and the testimony of Raymond S. Danis. Danis worked for the Department of Revenue and its predecessor

the Tax Commission from 1933 until his retirement in 1960. He was Railroad Assessor for 2 years and then became Supervisor of Railroad Assessments, later known as Railroad Assessment Supervisor. It was his duty to arrive at a valuation which was then recommended to the Director for final assessment. The director usually used his valuation as the assessment figure with minor adjustments. Upon final assessment it was his duty to certify the assessments to the counties. He testified that the method of arriving at railroad property valuations was practically unchanged from 1933 to 1960 except for a minor change which will hereafter be referred to. The statutory factors of capitalized earnings and market value of stock and debt were used together with cost of reproduction less depreciation. The average of the three factors was then taken to guide in the appraisal. Other information considered relevant was taken into consideration and applied to such average in the exercise of what he said was commonly called "the judgment factor", and that such judgment factor has always been applied. He testified unequivocally that to the best of his judgment the valuations fixed by him were the full fair cash value of each railroad in each year.

Danis made a minor change in procedure in 1957. The judgment factor was applied to the straight average until that time, but he then inaugurated a new type of explicit adjustment to the cost factor by a reduction for obsolescence (in addition to one for uneconomic property) before applying a final judgment factor to the average thus obtained. He is criticized by Collector's counsel for making reductions from the formulaic averages after the explicit reductions were made. It is also inferred that his testimony in the several cases over the years has been inconsistent. No foundation was laid for impeachment of Danis and he was not in fact impeached. A careful reading of this man's testimony indicates no evasion, and surprisingly few discrepancies in his testimony in this case, or between his testimony

in the several cases, considering the magnitude of the subject matter covered.

Charles M. Chapman, an expert in this field, was familiar with railroad valuation methods in Illinois and said that the three factors were used in some other states with emphasis upon capitalized income. He stated that every tax assessor is expected to exercise judgment. He was particularly critical of any extensive use of reproduction cost because price indices indicate that some items of property rose 300 percent or more of original cost since World War II. He said that cost, in any form, necessarily represents value only at the time of construction. Original cost probably must have been justified or the line would not have been built, but when the returns do not justify the investment there is a constantly increasing variation between the value and historical cost, and the gap becomes even wider by applying current prices to reproduction new.

Broley E. Travis, a consulting valuation engineer, expressed the opinion that it was sound appraisal practice to adjust an arithmetical result, and that based on the chart the 12 Madison County railroads were assessed at least at full, fair cash value between 1951 and 1962.

H. Clyde Reeves, with wide experience in the railroad valuation field with the State of Kentucky, was also critical of giving any substantial weight to reproduction cost and approved the use of judgment. He testified that if a formula incorporated Interstate Commerce Commission valuations as substantial indices of value, that a substantial judgment factor must be used "to get them out". As to the Gulf, Mobile and Ohio Railroad 1959 assessment it was his opinion that it was on the high side of tolerance.

Over the years the composite assessment figures for all major class I railroads in Illinois show a variance of over 100 million dollars and the assessed value of the 12 lines here involved varies in about the same proportion. The charts based on the assessment figures for these roads each

show considerable variance and they vary widely from road to road. In some instances the curve of one is upward while the curve of another is downward. In comparing assessments of Class I railroads in a particular year with those of the year immediately preceding many changes are found. For example, from 1951 to 1952, 14 were increased, 4 decreased and 4 remained unchanged, with a high percent of increase for one railroad of the group of 12% and a high percent of decrease of 1%; from 1956 to 1957, 28 were increased, 4 decreased and 5 remained unchanged, with a high increase of 6% and a high decrease also of 6%. The figures for the other years between 1950 to 1957 were in about the same proportions. Thereafter to 1960, the number of decreases was pronounced. The charts, and the figures upon which they are based, refute any argument that a static level of assessment was maintained.

All parties agree that of the three indicators of value reproduction cost less depreciation has been the most unstable, and the exhibits fully bear that out. After World War II such cost skyrocketed upward until it reached the astronomical figure of $2,162,197,000 in 1963, even after the Interstate Commerce Commission figures had been revised by the Department of Revenue by further reducing the condition percentage used by the Commission and applying the explicit adjustments for public improvements and obsolescence. This compares with a capitalized income value of $728,228,000 and market value of $877,776,000, both of which indicators had remained fairly level. If the cost factor is averaged equally with the other two ($\frac{1}{3}$ each), the relative weight of each factor to the straight average produced would be: cost 57.38%, market 23.29%, and income 19.33%. The charts of the 12 railroads involved depict the influence of the reproduction cost factor. From 1951 to 1958 the market factor line was lowest with the income factor slightly higher. The lines then crossed and the market line was slightly higher. The same is true of the average of

income and market which was fairly level around the $500 million mark. The level of assessment was higher at all times except for the period from 1954 to 1957 when the income was temporarily higher. During the same years the reproduction cost line rose from about the $1 billion mark and in a relatively steady manner until it reached approximately $1½ billion. This cost factor, of course, raised the straight average of the three from just under $700 million to about $900 million before dropping back in 1958. A further comparison may be drawn from the data sheets of one of the railroads ( the Burlington) for the same period. Income declined from a high of $155,355,000 in 1952 to a low of $100,595,000 in 1962, market value increased from $112,475,000 in 1951 to a high of $139,027,000 in 1958 and then steadily declined to $123,973,000 in 1962. Reproduction cost increased from a low of $219,050,000 in 1951 to a high of $336,645,000 in 1958, then receded gradually to $315,165,000.

The application of judgment or use of a judgment factor was recognized in the *North Western* case (6 Ill.2d 278,) the *Burlington* case (17 Ill.2d 376,) and *Kohorst,* and was given specific approval in *Hillison.* As was said in *Enrietta*: "A careful review of the entire record leads to the inevitable conclusion that judgment must be used by appraisers in the intricate problem of arriving at an assessed valuation of a railroad, whether it be by using various factors, then applying the judgment factor as is done in Illinois, or the choosing of a percentage for capitalizing net operating income and the fixing of the percentage weight to be given the reproduction cost factor. The Department has chosen a method to carry out the statutory mandate and has used it for many years. The method has received the tacit approval of this court in a number of cases. (Cases Cited.)" 29 Ill.2d 605, 608. We are not disposed to change those views.

Nor can we say that those in the Department who were

responsible for fixing railroad assessments abused their authority in the application of judgment. They certified that the resulting assessments were at full value and the Railroad Assessment Supervisor testified that to the best. of his judgment they were full value assessments. This evidence is not refuted. True, the record amply discloses that a formulaic or straight average of the three factors was not followed, but that does not solve the problem. The issue is whether the final assessments were at full value based on the two explicit statutory factors and such other information as the Department considered as bearing on fair cash value.

The parties have presented an argument which is difficult to follow. The railroads charge that the courts have no power to review or determine the value of property fixed by the administrative officers in the absence of fraud, actual or constructive, and that if they invade that field there is a violation of section 1 article IX of the constitution. Apparently this is based upon the fact that the Collector did not allege fraud on the part of the Department through the alleged undervaluation of railroad property. But the railroads did charge constructive fraud, and it follows that it was necessary for the court to consider whether there was a debasement of locally assessed property and similarly whether there was debasement of railroad property in order to determine whether there was discrimination and, if so, whether the degree of discrimination was so gross as to amount to constructive fraud. We do not have to pass upon the question of whether the trial court exceeded its authority in finding the exact degree of discrimination and ordering refunds based on such findings in view of the holding in this opinion.

It would also be futile to discuss whether the former cases are *res judicata* or whether the rules of collateral estoppel apply. Only a fraction of the railroads here involved were parties to the prior cases and all are parties to

this consolidated proceeding which is being decided as a unit since the proof applies to all.

Much of the record in *People ex rel. Korzen* v. *Chicago, Burlington & Quincy Railroad Co.* No. 38942 which involved evidence of sales of other railroads between 1947 and 1961 in an attempt to show the Department's railroad assessments to be less than full value has been introduced in this proceeding. The holding of incomparability in that case is controlling here.

In summary, the formulaic approach has never been adopted in this State and in fact has not been used. The judgment factor has been applied for a number of years and its use has been recognized and approved by this court. The record does not support the Collector's oft-repeated theory that in the use of judgment the Railroad Assessment Supervisors and the Directors abused their authority by debasing valuations in an effort to "hold the line". We hold that the proof establishes assessments of the railroads at substantial full value and that objectors are entitled to the refunds prayed for rather than refunds fixed by the trial court, which in each case was to be computed upon the straight average formulaic result without application of the judgment factor.

The judgments of the circuit court of Madison County are reversed, and the cause is remanded with directions to order refunds in conformity with the method outlined in the *Hillison* and *Kohorst* cases and subject only to the same limitations there fixed.

*Judgments reversed and causes remanded, with directions.*