(Nos. 40210-13, incl., cons.—

THE PEOPLE *ex rel.* Bernard J. Korzen, County Collector, Appellant, *vs.* THE BELT RAILWAY COMPANY OF CHICAGO, Appellee.

*Opinion filed March 29, 1967.*

WARD, J., took no part.
SCHAEFER and KLUCZYNSKI, JJ., dissenting.

DANIEL P. WARD, State's Attorney, of Chicago, (EDWARD J. HLADIS and THEODORE M. SWAIN, Assistant State's Attorneys, of counsel,) for appellant.

RICHARD F. KOPROSKE, EDWARD J. WRIGHT, MARK M. MOONEY, and ROBERT J. NOLAN, all of Chicago, for appellee.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is another in a series of railroad tax objection cases where the railroad (Belt Railway Company of Chicago) contends that discrimination in assessment value between its properties and locally assessed property is so gross as to be constructively fraudulent. It differs from the prior cases primarily in that there was a sale of the objecting railroad itself, which the collector designates as a contemporary sale.

The Belt filed tax objections for each of the years 1959 to 1962, inclusive, reciting that locally assessed property was assessed at not more than 50% of its market value and that its operating property was assessed at full value. It then filed motions for summary judgments with accompanying affidavits and exhibits. The collector admitted the level

of local assessment, denied that the railroad's operating property was assessed at full value and filed a countermotion for summary judgment. The trial court entered judgments for the Belt without specifically ruling on its motions to strike the counteraffidavits of the collector. The four causes have been consolidated on this appeal.

The rule has been established that where the Department of Revenue assesses a railroad's operating property in accordance with the recognized and approved factors, it will be presumed to have been assessed at full value as required by statute. (*People ex rel. Hillison* v. *Chicago, Burlington and Quincy Railroad Co.* 22 Ill.2d 88; *People ex rel. Kohorst* v. *Gulf, Mobile and Ohio Railroad Co.* 22 Ill.2d 104.) The affidavits in support of the motions for summary judgments included by reference the deposition of Raymond S. Davis, Supervisor of Railroad Assessments, used as evidence in various tax-objection cases for the years 1959 and 1960, his testimony in some of those cases, (*e.g., People ex rel. Wenzel* v. *Chicago and North Western Railway Co.* 28 Ill.2d 205,) and the testimony of Davis's successor, Edward F. Konkel, and Harry L. Hulman, Deputy Director of the Department of Revenue, in *People ex rel. Musso* v. *Chicago Burlington & Quincy Railroad Co.* 33 Ill.2d.88. These railroad assessment authorities unequivocally testified that Illinois railroads were assessed at 100% of full fair cash value for the taxable years in question. Thus, the railroad not only was entitled to the benefit of a presumption of full value, but the affidavits and exhibits made a *prima facie* case of full value assessment.

The collector contends that the sale price is an objective indication of fair cash market value and that the percentage relationship of assessed to full value of the Belt's property did not exceed the assessment level of locally assessed property by an amount sufficient to constitute constructive fraud. He theorizes that the evidence adduced in his counteraffidavits in support of his answers and· countermotions

raised a sufficient factual question as to the value of the property to prevent summary judgments for the railroad and, in the absence of counteraffidavits contravening the factual matters alleged in his affidavits, those facts stand admitted and the court should have granted the counter-motions and overruled the Belt's objections.

The operating property was assessed for the years in question as follows: $24,000,000 in 1959, $22,650,000 in 1960, $21,950,000 in 1961, and $20,400,000 in 1962. The total sale price of the railroad was $36,785,417.27 of which about $1,689,146 was the value of its nonoperating property, leaving approximately $35,096,271 as the sale price attributable to the operating property. The collector then computes the percentages which the assessed value bears to the sale price of the operating property at 68.4%, 64.5%, 62.5% and 58.1%, respectively, for the four years, and contends that the percentage difference between the railroad's property and locally assessed property is not great enough to amount to constructive fraud.

It goes without saying that a contemporaneous sale between parties dealing at arms length is not only relevant to the question of fair cash market value, (see *People ex rel. Korzan* v. *Chicago, Burlington & Quincy Railroad Co.* 32 Ill.2d 554 and *People ex rel. Musso* v. *Chicago, Burlington & Quincy Railroad Co.* 33 Ill.2d 88,) but would be practically conclusive on the issue of whether an assessment was at full value.

The only showing made by the collector was through exhibits attached to the counteraffidavits giving the assessed values of the operating property for the years 1951 through 1962 and copies of the report of the Interstate Commerce Commission approving the proposed sale and the order confirming the sale. The report discloses that while this sale was consummated in 1962, it had its origin in 1912. The Belt, under a lease agreement dated November 1, 1912, leased 376.30 miles of main, secondary and switch tracks

from the Chicago and Western Indiana Railroad Company for fifty years. It uses the leased trackage for its terminal and switching operations over which it interchanges traffic with 28 railroads in the Chicago switching area. The lease agreement included an option to purchase all the leased properties, which provided that notice of intention to exercise the option be given at least one year prior to September 1, 1962. The price is expressed in the lease in terms of a formula which includes a lump sum for the existing property in 1912 plus the amount paid for additions and betterments during the term of the lease. The parties to the lease adjusted the figures to reach the sale price heretofore indicated, the improvements and betterments being almost one half of that total. The Belt does not, of course, question the method by which the ultimate sale price was reached nor the amount, but it contends that the sale price does not reflect fair cash market value.

The ultimate question is whether, under the circumstances here prevailing, the sale price is a reliable indicia of fair cash market value. If not, there is no evidence to refute the presumption of full value assessment by the assessment authorities and their oft-reiterated testimony throughout the series of railroad tax-objection cases that railroad assessments in Illinois were at full fair cash value and summary judgment was proper.

There are several factors which militate against classifying this as a true contemporaneous sale. The sale price was interwoven with a fifty-year lease of the property. Upon exercise of the option the 1912 value of the railroad property as it then existed was to be paid plus the full cost of additions and betterments. Thus, depreciation of neither the existing facilities nor the subsequent additions was taken into account. The price was to be computed without regard to obsolescence through greater technical knowledge, improved construction methods or general obsolescence. It did not take into account that some new installations may

have been made for increasing the public safety without a commensurate increase in investment value or return on the additional investment. No account was taken of change in economic conditions between 1912 and the date of sale which is a matter of common knowledge.

It is argued that if the price were not consistent with current values, the Belt was not obligated to buy. This would ordinarily be true, but the factual situation as disclosed by the Interstate Commerce Commission report indicates that there were considerations other than market value which dictated approval of the sale. Acquisition of the property by the Belt was recognized to be practically mandatory regardless of price by the commission in the following language: "The lease agreement provides for no alternative to the purchase of the properties if the applicant [Belt] desires to continue their [sic] use and operation. Unless the applicant exercises its option, no assurance exists that it can continue to perform its essential switching services and functions in the Chicago area and there is likewise no assurance that any other carrier, including Railroad [C. & W. I. R.R.], can perform these functions. Accordingly * * * the applicant served notice that it intended to exercise its option to purchase the properties." By this language the commission recognized the fact that the interested railroads, through ownership of the Belt, were at the mercy of the lessor, and that the price was not subject to bargaining. True, they could have let the lease and option privilege lapse and then try to effect a purchase, but there was no assurance of success. Negotiations might be long and protracted during which service would decline and a further loss of business to other forms of transportation could be anticipated. If they failed and the property was sold to strangers there was no guarantee that a satisfactory lease arrangement could be effected.

The collector argues that the quoted statement was out of context and exercise of the option would also result in

an economic benefit to the purchaser so that a higher price was justified. This is based upon the finding that the purchase will make the properties more attractive to investment capital and create a greater incentive on the part of the proprietary companies to locate additional plants and other shippers in the area served by the Belt. This is followed by recognition that the cost would be more than offset by the savings in rental payments under the 1912 lease. It is inferred by the collector that these findings constituted a balancing and justify the high purchase price. On the contrary, we think that by those findings the commission recognized the practicalities in approving the sale as a solution of the problem because it was consistent with the public interest.

In order for the sale price of property to be used as the market value, the transaction must be between a willing buyer and a willing seller, neither of whom are under compulsion to buy or sell, and no account should be taken of values or necessities peculiar to either party. (See *City of Chicago* v. *Harrison-Halsted Building Corp.* 11 Ill.2d 431; *Ligare* v. *Chicago, Madison and Northern Railroad Co.* 166 Ill. 249; *City of Chicago* v. *Farwell,* 286 Ill. 415.) Here, the commission's report indicated that the facilities were necessary to the Belt and its proprietary owners and that it had a value peculiar to it and them.

Furthermore, there is an interlocking of stock ownership between the parties, and a mutual use of the property under the lease. Belt's operations are carried on principally by the use of the leased trackage. It is wholly owned by 12 line-haul railroads, 11 of which each own 2400 shares and the Chesapeake and Ohio owns 4800 shares. The proprietary companies have the privilege of interchanging cars directly with one another and operating their own trains over the Belt's trackage. Five of the 11 companies; namely, Chicago and Eastern Illinois, Monan, Wabash, Erie-Lackawanna, and Grand Trunk Western, in turn, own all of the stock of C. & W.I.

The collector seeks to avoid the label "intercorporate transaction" by directing attention to the fact that Belt, the corporation, owns no part of the C. & W.I. although five of the twelve owners of Belt own all of the stock of the C. & W.I. While ownership of the seller is by fewer than all of the owners of buyer, a sale between them is still a far cry from an arm's length transaction. In *People ex rel. Korzen* v. *Chicago, Burlington & Quincy Railroad Co.* 32 Ill.2d 554, this and like transactions were classified as intercorporate and "tie-in" sales, and, for those and other reasons, were held inadmissible to establish comparability. Similarily, we are of the opinion that the inter-relationship of the parties through their common corporate owners, even though the interests are not entirely common or equal, cannot be ignored and must be considered as a strong factor in determining admissibility.

When all the circumstances are taken into consideration including noncontemporaneousness of the date of establishment of the sale price with the dates of assessment, the tie-in of the option with the lease, the necessity of the railroads' access to each other's facilities available only over seller's facilities and the cross-ownership of the stock of the two railroads, we are of the opinion that this sale is wholly inadmissible as evidence of fair cash market value. The counteraffidavits in support of the answers do not raise a factual question and the granting of summary judgment was, therefore, proper.

We note that while the orders for refunds spell out in detail the amount of the illegal rate for each interested taxing body, together with the valuation and amount to be refunded, they do not specify the formula used in arriving at the amount of the several refunds. The computations are in accord with the amounts claimed in the objections, which in turn were based upon the formula laid down by this court in *People ex rel. Kohorst* v. *Gulf Mobile and Ohio Railroad Co.* 22 Ill.2d 104, and *People ex rel. Hillison* v. *Chicago,*

*Burlington and Quincy Railroad Co.* 22 Ill.2d 88. Since neither the formula nor computation has been questioned the detailed judgment order stands.

The judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

Mr. JUSTICE WARD took no part in the consideration or decision of this case.

Mr. JUSTICE SCHAEFER, dissenting:

The problem here is the determination of the value of the property of the Belt Railway Company of Chicago. That very property was sold for an amount substantially more than the amount at which it had been assessed. I can not agree that "this sale is wholly inadmissible as evidence of fair cash market value."

The railroad's property is strategically located, which is why it is valuable. In the absence of evidence of a sharp change in values, the sale of this property, finally approved by the Interstate Commerce Commission in 1962 is sufficiently close in point of time to be relevant evidence of its value during the years 1959 through 1962. This is particularly true because sales of railroads are rare. The fact that the sale resulted from the exercise of an option contained in a long-term lease does not, of course, affect its value as evidence. Regardless of the formula by which the sale price was computed and "adjusted", the purchasing railroads voluntarily paid it. The suggestion that if they let the option lapse they had no assurance that they could successfully purchase the property thereafter hardly seems to distinguish this situation from other sales resulting from the exercise of options. And the fact that if "the property was sold to strangers there was no guarantee that a satisfactory lease arrangement could be effected" by the interested railroads suggests that the property might have greater value to some other railroad, or group of railroads, or to a

purchaser who would devote the property to other uses. The Interstate Commerce Commission's statement that there is "no assurance that any other carrier  *  *  *  can perform these functions" is not a statement that the services are essential to the public or that the services would otherwise go unperformed. The Commission's findings of substantial economic benefits to the purchasing railroads should not be disregarded. The argument that the sale price did not represent value because several railroads were involved carries the inference that some group of stockholders was unfairly preferred over others. I am unwilling to accept that inference.

But even if the factors relied upon by the majority to bar evidence of the sale were more persuasive than I think they are, they still would not make the evidence "wholly inadmissible". Like particularized details peculiar to any other transaction, they should be submitted to the trier of the facts for such weight as they may be accorded.

Mr. JUSTICE KLUCZYNSKI concurs in this dissent.