# Illinois Official Reports

## Appellate Court

---

*Gateway-Walden, LLC v. Pappas*, 2018 IL App (1st) 162714

---

| | |
|---|---|
| Appellate Court Caption | GATEWAY-WALDEN, LLC, Plaintiff-Appellee, v. MARIA PAPPAS, Cook County Treasurer, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-2714 |
| Filed | August 30, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-COTO-3720; the Hon. Paul A. Karkula, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Kimberly M. Foxx, State's Attorney, of Chicago (Chaka M. Patterson, Kent S. Ray, Benjamin R. Bilton, Cristin Duffy, and John J. Coyne, Assistant State's Attorneys, of counsel), for appellant.<br><br>Saul Ewing Arnstein & Lehr LLP, of Chicago (Hal R. Morris, David C. Durkin, and Elizabeth A. Thompson, of counsel), for appellee. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff owns commercial office space in Schaumburg (Property). For the purposes of 2011 property taxes, Cook County valued the Property at approximately $10.4 million. Plaintiff disagreed with this valuation and filed suit. After a bench trial, the circuit court entered judgment in favor of plaintiff and found that the Property's fair cash value was $7.3 million. Defendant appealed. For the following reasons, we affirm the circuit court's judgment.

¶ 2                                    BACKGROUND

¶ 3    The Property consists of three separate multi-tenant office buildings. Before 2011, the Property was owned by a third party who had a mortgage with Wells Fargo. The previous owner failed to meet its mortgage obligations, and Wells Fargo filed a foreclosure action. During that proceeding, the circuit court of Cook County appointed a receiver, Daniel Hyman. At the conclusion of the foreclosure case, Wells Fargo made a credit bid at the sheriff's sale. The circuit court confirmed the sale to Wells Fargo near the end of February 2011.

¶ 4    While receiver, Hyman contacted Gerald Nudo. Nudo was a manager at Marc Realty and had previously done business with Hyman. Beginning in February 2011, Nudo expressed interest in purchasing the Property. Nudo testified that there were a number of offers exchanged in mid-2011. There is conflicting testimony about whether Hyman or Nudo initiated offers for the Property. Ultimately, Wells Fargo, or its agent, accepted Marc Realty's offer, and the Property was put under contract in November 2011. Marc Realty created Gateway-Walden, LLC, the plaintiff, to own and operate the Property. The sale closed in January 2012 with a final price of $7.3 million.

¶ 5    Plaintiff disputed the assessor's 2011 property tax assessment and filed suit to challenge the $10.4 million property valuation; the case proceeded to bench trial. At trial, the parties each presented evidence regarding the Property's value.

¶ 6                          Plaintiff's Expert: Eric Enloe

¶ 7    Plaintiff presented the expert testimony of Eric Enloe of Integra Appraisal. Enloe had appraised the Property in late 2011, not for purposes of this litigation, but rather for Associated Bank for loan underwriting purposes. A sales contract was pending on the Property, and the bank was considering issuing a mortgage on the Property. (As we will explain, the sale went through—plaintiff bought the Property for $7.3 million in January 2012.)

¶ 8    Enloe opined that the Property had a value of $7.5 million dollars as of December 2011. Enloe also made prospective stabilized and completion valuations: $9.5 million as of 2013 and $10 million as of 2014. Enloe explained that the disparity in these values had to do with the need to stabilize the Property and make capital improvements. Specifically, the Property was approximately 29% vacant, which was consistent with the market at the time. He opined that the property owner would need to bring the vacancy rate to around 15% before it would be considered stabilized. Additionally, Enloe estimated that there would need to be approximately $500,000 in expenditures to repair the HVAC system and parking lot.

¶ 9    In reaching his conclusion, Enloe employed the sales comparison approach (resulting in a valuation of $7.2 million for 2011) and the income capitalization approach (from which Enloe

obtained a $7.5 million valuation for 2011, the valuation he adopted). Enloe recognized that there was a third common approach, the reproduction cost approach, but explained that he did not conduct this analysis because that approach is not particularly relevant when considering the purchase of the Property.

¶ 10 Properties are given letter grades that reflect their amenities: security guards, finishings, access to local amenities, and the like. "A" properties are the nicest, most modern properties. Enloe described the Property as a "B" or "B/C" property in average condition. Enloe also stated that his valuations were for a leased fee interest in the Property. He testified that a fee simple valuation is free and clear of any other interest. On the other hand, a leased fee interest is where a party takes ownership of property subject to existing leases. He testified that there was nothing abnormal about valuing a leased fee interest for property that was going to be used for leasing office space.

¶ 11 In conducting his sales comparison approach, Enloe used five sales that, in his opinion, were comparables. These comparables were multi-tenant leased fee buildings that sold between 2009 and 2011. He opined that the market was devastated by the real estate crash, and he felt it necessary to use sales that occurred post-recession to get a valuation that reflected the current reality; Enloe criticized defendant's expert for using sales that occurred before the crash. In response to defendant's criticism that Enloe's comparables were lower quality than the Property—including one with a 100 percent vacancy rate—Enloe acknowledged that some of his comparables were of a lesser quality than the Property, but he testified that he made positive adjustments to compensate.

¶ 12 Though he used the sales comparison approach, Enloe placed the highest emphasis on the income capitalization approach. There are various accepted analyses within the income capitalization approach. Relevant to this appeal are the "direct capitalization approach" and the "discounted cash flow analysis." The direct capitalization approach determines a net operating income and applies that to a capitalization rate to arrive at a value. The discounted cash flow analysis is used when there are leases in place; it makes projections about vacancies and expenditures over the next 10 years to arrive a present value.

¶ 13 Enloe opined that direct capitalization was more appropriate for long term, single tenant buildings, whereas discounted cash flow was better for multi-tenant buildings with lease turnover. Enloe used the discounted cash flow analysis in this case due to the number of vacancies and the expenses associated with the "lease-up" of the Property. To determine the projected income and costs associated with leasing the Property, Enloe used seven lease comparables, focusing on "B" office buildings. Using these variable inputs, Enloe used a market standard program called ARGUS to arrive at his $7.5 million value.

¶ 14 On cross-examination, Enloe admitted that typically, for tax valuations, the direct capitalization method is used and a discounted cash flow is not included. He had not prepared his appraisal for tax valuations but rather for a bank that wanted to confirm the Property's fair market value before issuing a mortgage. On redirect, he testified that the discounted cash flow analysis is an "accepted and typical approach" that he has seen used in tax appraisals, too. More importantly, he testified that both approaches determine a property's value—which is ultimately what matters.

¶ 15                        Defendant's Expert: Stephen Jackson

¶ 16        Defendant presented the expert testimony of Stephen Jackson. Jackson conducted a retrospective valuation of the Property in 2014. Jackson opined that the Property had a value of $12 million as of January 1, 2011. Jackson valued the Property at $12 million under all three approaches: the sales comparison approach, the income capitalization approach, and the cost approach. While Jackson conducted the cost approach, he testified that it was of almost no value to his ultimate opinion. Like Enloe, Jackson relied on the income capitalization approach, supported by the sales comparison approach.

¶ 17        Jackson testified that he valued the Property at "market value," defined consistently with the tax code, for a fee simple interest. He acknowledged that the Property was sold for $7.3 million in January 2012, but he did not give any weight to this sale because, in his opinion, it did not appear to be a market value sale.

¶ 18        Jackson categorized the building as a "B" or "A-/B" building in good to average condition as of 2014. In conducting the sales comparison approach, Jackson used five sales that he believed were comparable. The comparables were multi-tenant office buildings sold between 2006 and 2009 in arms-length sales; plaintiff heavily criticized Jackson's use of pre-recession sales as a way of avoiding distressed sales. Jackson acknowledged that each of his comparables was superior to the Property, and that none of those sales needed capital expenditures. To compensate, Jackson testified that he made (significant) downward adjustments to his comparables price to arrive at his value of the Property. Plaintiff emphasizes that many of these adjustments were extremely significant: for example, $137.39 per square foot was adjusted to $49.46 per square foot, and $192.63 per square foot was adjusted to $52.10 per square foot.

¶ 19        While Jackson agreed with Enloe that the best method was the income capitalization approach, he believed that the proper analysis within that approach was the direct capitalization method, not the discounted cash flow analysis that Enloe used. Jackson explained that the discounted cash flow analysis was inappropriate for tax valuation because it adjusts for the payment of property taxes. Jackson additionally criticized Enloe for using an inflated property tax payment estimate. Specifically, Jackson opined that the property taxes assumed by Enloe's analysis indicated a market value of $14 million—higher than even his valuation. Using this inflated number, he said, drives the present value down because it presumes significant, unsupported, future expense, which affects present value because you work backwards. According to Jackson, that was the biggest problem with Enloe's discounted cash flow evaluation. In contrast, said Jackson, the direct capitalization approach eliminates this "circular reference" problem, as it does not consider property taxes when determining property value, and it is especially more appropriate when using the income capitalization approach for the purpose of determining what those property taxes should be.


¶ 20                        Remaining Trial and Judgment

¶ 21        At the close of plaintiff's case-in-chief, defendant moved for a directed finding. On appeal, defendant contends it moved for a "directed finding based on plaintiff's failure to meet its burden by clear or [*sic*] convincing evidence, as well as failure to provide opinion as to value on the lien date." The citation to the record provided for this argument is incorrect, and we have found no evidence to support the contention that defendant made these specific arguments. The record shows the following regarding defendant's motion for directed finding:

          "MS. DUFFY: Your Honor, I would like to make a motion for directed finding.

THE COURT: Well, no, that will be denied."

What is clear from the record is that defendant moved for directed finding, and the trial court denied that motion—nothing more or less.

¶ 22 After both experts testified, plaintiff sought to call two rebuttal witnesses: Hyman and Nudo. Defendant objected, arguing that these witnesses were not disclosed and that allowing them to testify would be a discovery violation. Initially, the court granted defendant's motion to bar and refused to allow the two rebuttal witnesses. On plaintiff's motion, the court reconsidered and allowed Hyman and Nudo to testify. Earlier in the case, the issue of these rebuttal witnesses had been raised, and the court had given defendant three weeks to depose them, but it does not appear as though that happened.

¶ 23 In any event, Hyman and Nudo testified. Plaintiff called Hyman and Nudo to rebut Jackson's testimony that the January 2012 sale was not a market value, arm's-length transaction.

¶ 24 The court issued a written opinion in favor of plaintiff. In its order, the court made specific findings relevant to this appeal:

"The court further notes that the property actually was sold for $7.3 million.

* * *

3. The credible testimony and records produced at trial support the factual conclusion that the aforementioned sale was the result of an arm's length transaction between a willing seller and willing buyer as well as a product of constant, sophisticated and contemporaneous negotiations.

4. Plaintiffs [*sic*] appraiser most accurately and credibly utilized all appropriate commercial real estate market methodology to arrive at his conclusion of valuation including but not limited to : [*sic*]

a. Location

b. Vacancy Rate

c. Real Estate market economic status

d. Realistic comparables

e. Maintenance/improvement costs

f. Income capitalization analysis

g. Discounted cash flow accounting

5. Plaintiff's appraisal existed at the relevant point of reference procured for loan underwriting. The court found no bias exhibited in the appraiser's testimony or written appraisal.

6. Defendant's appraisal was completed upon request of defendant for anticipated use in litigation, his attempt to artificially reconstruct a valuation from 2011 was not as useful or reliable as the plaintiff's.

7. The plaintiffs [*sic*] have rebutted the presumption of correctness of the assessed value by clear and convincing evidence[.]"

¶ 25 The trial court valued the Property at $7.3 million. This appeal followed.

¶ 26                                               ANALYSIS

¶ 27      We review the trial court's findings to determine whether they are against the manifest weight of the evidence; that is, we will reverse findings of fact only "where all reasonable and unbiased persons would agree that it is erroneous and that the opposite conclusion is clearly evident." *La Salle Partners*, *Inc. v. Illinois Property Tax Appeal Board*, 269 Ill. App. 3d 621, 632 (1995). A trial judge, as the trier of fact, is in a superior position to observe the conduct of the witnesses while testifying. *People v. A Parcel of Property Commonly Known as 1945 North 31st Street, Decatur, Macon County, Illinois*, 217 Ill. 2d 481, 510 (2005). Accordingly, findings of fact are entitled to deference—especially credibility determinations. *Id.*

¶ 28      In a tax-objection proceeding, "[t]he taxes, assessments, and levies that are the subject of the objection shall be presumed correct and legal, but the presumption is rebuttable. The plaintiff has the burden of proving any contested matter of fact by clear and convincing evidence." 35 ILCS 200/23-15(b)(2) (West 2016). "Clear and convincing evidence" requires more than preponderance of the evidence, but not quite as much as proof beyond a reasonable doubt. *In re D.T.*, 212 Ill. 2d 347, 362 (2004).

¶ 29      Here, the trial court expressly found that plaintiff rebutted the presumption of validity by clear and convincing evidence. It did so because it found that (1) there was an arm's-length sales transaction near the time of the relevant tax year and (2) in any event, plaintiff's expert, Enloe, was more credible, and his valuation more accurately reflected market value.

¶ 30      Defendant raises a number of arguments on appeal. Defendant contends that (1) Enloe applied the wrong "methodology" to his valuation, (2) the trial court's findings were against the manifest weight of the evidence, (3) the trial court's denial of defendant's motion for a directed finding was against the manifest weight of the evidence, and (4) the trial court abused its discretion by allowing the rebuttal testimony of Hyman and Nudo.

¶ 31                              I. Sale of the Property in January 2012
¶ 32                           A. Trial Court's Finding of "Arm's-Length Sale"
¶ 33      There are three accepted methodologies for valuing real property for taxation purposes, which we will discuss shortly. But overriding them all is one bedrock principle of law: A recent, arm's-length sale of the property is the best evidence of its fair market value. As our supreme court wrote decades ago: "It goes without saying that a contemporaneous sale between parties dealing at arms length is not only relevant to the question of fair cash market value [citations], but would be *practically conclusive* on the issue of whether an assessment was at full value." (Emphasis added.) *People ex rel. Korzen v. Belt Ry. Co. of Chicago*, 37 Ill. 2d 158, 161 (1967); see also *Walsh v. Property Tax Appeal Board*, 181 Ill. 2d 228, 230 (1998) ("Fair cash value is synonymous with fair market value and, as such, an arm's-length sales transaction is the best evidence thereof.").

¶ 34      That principle remains true today. See, *e.g.*, *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 479 (2008) (*Omni*); *Board of Education of Meridian Community Unit School District No. 223 v. Illinois Property Tax Appeal Board*, 2011 IL App (2d) 100068, ¶ 36 (*Onyx*); *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 43. We have consistently said as much because appraisal methodologies are merely estimates—best approximations—while an actual sale between two disinterested

parties, acting in their self-interests without compulsion, removes the question from the theoretical guess to actual market reality. See *Omni*, 384 Ill. App. 3d at 480.

¶ 35    Here, the trial court found that an arm's-length sale of the Property took place in January 2012, the month following the relevant tax year, 2011. Defendant says that this finding was against the manifest weight of the evidence.

¶ 36    As we summarized above but explain in more depth here, the evidence shows that Daniel Hyman was appointed as receiver of the Property in approximately February 2010 and served that role for approximately one year. Hyman approached Gerald Nudo (a manager at Marc Realty) "and a number of other people" to see if they had an interest in acquiring the Property. Nudo's company, Marc Realty, owned about 50 office buildings, including the one next door and one down the street from the Property. Hyman and Nudo knew each other, and Hyman was familiar with Marc Realty's niche. Hyman and Nudo had done business together in the past, including once (but no longer, at the time of trial) owning properties together, and Hyman had sold Nudo other buildings in the past. Hyman quoted a figure of $9 million for the Property, which Nudo found "absurdly high." Nudo recalled that Hyman "may have called us one more time" to discuss a purchase of the Property, but nothing came of it.

¶ 37    Later that year, in the fall of 2011, after Hyman's role as receiver had ended, Nudo engaged in further negotiations with someone named Gary Nussbaum of Transwestern, who had been hired as the marketing agent for the servicing agent, C-III Centerline, acting on behalf of the Property's owner, Wells Fargo. Nudo had purchased buildings from Nussbaum in the past.

¶ 38    Ultimately, in November 2011, Nudo submitted an offer of $7.3 million for the Property, which Transwestern accepted on behalf of Wells Fargo. (Nudo testified that Wells Fargo is a major national entity, and that in the regular course of negotiations, he dealt with Wells Fargo's agents, C-III Centerline and Transwestern.)

¶ 39    Marc Realty created Gateway-Walden, LLC—the plaintiff here—to own and operate the Property. The sale closed in January 2012 with a final price of $7.3 million.

¶ 40    The trial court made a specific finding that the property was sold in an "arm's length transaction between a willing seller and willing buyer as well as a product of constant, sophisticated and contemporaneous negotiations." In fact, the court apparently found the evidence of the arm's length transaction so compelling that it found the fair market value to be the same as that sale price: $7.3 million.

¶ 41    Defendant says the opposite conclusion is clearly evident, calling the sale "an inside deal between long time business partners and friends," referring to Nudo and Hyman. In addition, says defendant, "there was no evidence of widespread marketing" of the Property and "the [P]roperty was in a distressed state."

¶ 42    The biggest problem with this argument is that, while Hyman may have initiated the first contact with Nudo—the record is not entirely clear on that point, as witnesses at trial in 2016 struggled to recall negotiations five years earlier, in 2011—Hyman dropped out of the negotiations long before they ended in a deal in the fall of 2011. His role as receiver had ended. Nudo was then negotiating with Wells Fargo's agents, not Hyman. Hyman had no role in that final negotiation. He received no commission for that deal (Transwestern did).

¶ 43    Nudo testified that he had no personal relationship with Wells Fargo or its agents, and he testified without contradiction that Wells Fargo did not seem to be in any hurry to sell the Property, "distressed" as it was or otherwise. As for the existence of widespread marketing, the

record is hazy at best. Nudo was shown some marketing materials, purportedly issued by Transwestern regarding the Property, but he testified that he could not remember what materials were issued on a property he bought five years ago. Defendant's expert, Jackson, said he had "no third-party knowledge" of marketing materials, though he acknowledged that Enloe's appraisal from December 2011 referenced those materials.

¶ 44 From the record, we could not possibly conclude that the trial court's factual finding of an "arm's length transaction between a willing seller and willing buyer as well as a product of constant, sophisticated and contemporaneous negotiations" was so unsupported by the evidence that the opposite conclusion was clearly evident. We uphold that finding.

¶ 45 As such, the record demonstrates that an arm's-length sale of the Property was consummated in the very tax year at issue—2011—and closed less than a month into the following year, in January 2012. That "practically conclusive" (*Korzen*, 37 Ill. 2d at 161) determination of fair market value of the Property leaves defendant with a tall hurdle to climb.

¶ 46         B. Propriety of Nudo, Hyman Testimony

¶ 47 Defendant argues that plaintiff never should have been allowed to call Hyman or Nudo as witnesses. Defendant says that they should have been barred because they were not proper "rebuttal" witnesses and because of discovery violations. We will take those in order.

¶ 48 Evidentiary rulings are largely within the discretion of the trial court and will not be disturbed absent an abuse of discretion. *Kayman v. Rasheed*, 2015 IL App (1st) 132631, ¶ 62. The plaintiff may call rebuttal witnesses if they tend to " 'explain, repel, contradict or disprove the evidence of [a witness].' " *Chapman v. Hubbard Woods Motors, Inc.*, 351 Ill. App. 3d 99, 106 (2004) (quoting *Lagestee v. Days Inn Management Co.*, 303 Ill. App. 3d 935, 942 (1999)).

¶ 49 Hyman and Nudo were clearly rebuttal witnesses. Defendant's expert, Jackson, testified that he did not believe the January 2012 sale was an arm's-length transaction, and plaintiff called these witnesses for the specific purpose of establishing the circumstances surrounding that sale to prove that it was, in fact, an arm's-length transaction between sophisticated parties. This testimony is the type that would tend to repel or contradict Jackson's testimony. It was proper rebuttal testimony.

¶ 50 Next, we consider defendant's claim that the trial court should have barred these witnesses' testimony as a discovery sanction. The purpose of a sanction is not to punish but to coerce compliance with discovery rule. *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 123 (1998). A just sanction is one that, "to the degree possible, insures both discovery and a trial on the merits." *Id.* A court's decision to impose a specific sanction is only warranted where there is a "clear abuse of discretion." *Id.*

¶ 51 In January 2016, the trial court granted defendant leave to depose Nudo; the notice of deposition was sent in February. The parties engaged in discussions pursuant to Illinois Supreme Court Rule 201(k) (eff. Jan. 1, 2013). During these discussions, plaintiff tendered some documents, and defendant agreed to "forego deposing Mr. Nudo in the '11 case in order to keep things moving." (Another case, involving another tax year, was also pending.)

¶ 52 Later, defendant moved *in limine* to bar the testimony of Hyman and Nudo. That motion is not in the record, but we have a transcript of the hearing. The basis of the motion was plaintiff's discovery violations. In June, the court entered and continued the motion and ordered plaintiff to produce the witnesses for deposition and to produce all documents requested. The court

gave the parties time to complete the rebuttal discovery. At the time of the June order, defendant was aware that plaintiff wanted to call both Hyman and Nudo.

¶ 53    In July 2016, defendant filed an emergency motion to compel, and/or for sanctions, arguing that plaintiff had failed to produce. On July 19, the court entered and continued the motion and ordered plaintiff to "produce discovery requested in the previous order, to the best of their ability ***. *** [Plaintiff] will produce affidavit of completeness as to both witnesses in compliance with Rule 214. The Parties will coordinate the deposition schedule of the two Rebuttal [*sic*] witnesses."

¶ 54    The record does not indicate what occurred with regard to this discovery issue between the July 19 order and August 30. What we do know is that on August 30, the court granted defendant's motion *in limine* and barred Hyman and Nudo's testimony. The next day, plaintiff sought reconsideration. That motion is not in the record; we are not even sure whether it was oral or written. Nor do we have a transcript of the hearing on the motion to reconsider. We do have the order, however. The court granted the motion to reconsider and ordered plaintiff to produce the final document and an affidavit of completeness. Ultimately, Hyman and Nudo testified at trial.

¶ 55    The record concerning the court's basis to allow these rebuttal witnesses is incomplete. From what we can decipher, defendant contended that plaintiff failed to disclose the witnesses and comply with document requests. But none of the disclosures are in the record; the only request in the record is a rider to the February notice of deposition for Nudo. We do not have the transcript of the hearing where the trial court granted plaintiff's motion to reconsider. Where there is an incomplete record, any doubts arising from that incompleteness are resolved against the appellant—here, defendant. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 56    The record shows there was some disagreement between the parties about what was tendered and when. The court, in its discretion, attempted to facilitate plaintiff's compliance with discovery. Based on the transcripts we do have, plaintiff produced at least some of the documents which defendant was requesting. At first, the court considered plaintiff's conduct and decided to grant the defendant's motion to bar. We do not know *why* the trial court decided to reconsider that decision, given the lack of a record. Plaintiff says that reconsideration was properly granted, and the witnesses allowed to testify because it was defendant who consistently said she did not want to depose these witnesses.

¶ 57    But we leave it at this: In the absence of any basis in the record for the trial court's decision to reconsider its sanction, we will not attempt to guess at why the trial court decided to allow Hyman and Nudo to testify. Instead, we must assume that the court acted appropriately under the law, and we cannot find an abuse of discretion. See *id.* at 392 ("As there is no transcript of the hearing on the motion to vacate here, there is no basis for holding that the trial court abused discretion in denying the motion.").

¶ 58                          II. "Methodology" Used by Expert
¶ 59                          A. Standard of Review
¶ 60    Defendant raises several challenges to the "methodology" employed by plaintiff's expert, Enloe. We must first determine our standard of review, a subject of dispute. It will help if we start with some context. We have summarized Illinois law on the valuation of real property for taxation purposes as follows:

"Illinois law requires that all real property be valued at its fair cash value, estimated at the price it would bring at a fair voluntary sale where the owner is ready, willing, and able to sell but is not compelled to do so, and the buyer is likewise ready, willing, and able to buy but is not forced to do so. [Citation.] 'Fair cash value' is synonymous with fair market value, and an arm's-length sales transaction is the best evidence thereof. [Citation.] There are three basic methods of evaluating real property: (1) the sales comparison approach; (2) the income approach; and (3) the reproduction cost approach. [Citation.] In the absence of market value established by a contemporaneous arm's-length sale, the sales comparison approach is the preferred method and should be used when market data are available. [Citation.]" *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 43.

¶ 61    Defendant claims that all of her challenges to Enloe's "methodology" should be reviewed *de novo*. That is incorrect. It is an oversimplification. As we just quoted above, Illinois law recognizes three methodologies for the valuation of real property—sales comparison, income capitalization, and reproduction cost—and generally favors the sales comparison approach among them.

¶ 62    We have traditionally conducted *de novo* review on the question of whether an appraiser properly ignored the preferred methodology—the sales comparison methodology—in a given case, and we have rejected the refusal to use that methodology when market data was available to make sales comparisons. See, *e.g.*, *id.* ¶¶ 43-44; *Omni*, 384 Ill. App. 3d at 479 (error where appraiser did not apply sales approach); *United Airlines, Inc. v. Pappas*, 348 Ill. App. 3d 563, 572 (2004) (same); *Chrysler Corp. v. Illinois Property Tax Appeal Board*, 69 Ill. App. 3d 207, 210, 214 (1979) (same).

¶ 63    We have upheld an appraiser's refusal to use the sales comparison approach only when sales data was unavailable due to the unique nature of the property—a fairly rare occurrence. See, *e.g.*, *Kendall County Board of Review v. Property Tax Appeal Board*, 337 Ill. App. 3d 735, 741 (2003) (not error to exclude sales comparison method, as property was zoned for agricultural use with special-use permit for telecommunications; evidence showed no actual or potential market); *Onyx*, 2011 IL App (2d) 100068, ¶¶ 36, 53 (upholding lack of sales approach in valuing sanitary landfill, as evidence showed no reliable market sales—recent sales had been compelled by federal divestiture order, and landfill was depreciating asset with no other appreciable use).

¶ 64    It makes sense to review that question *de novo*. Illinois law clearly favors the sales comparison approach; either that approach was used or it was not used; and if it was not, we need only review the record to determine whether there was evidence of reliable, comparable sales. We are not required to delve into the minutiae of expert testimony or make credibility determinations appropriately left to the trier of fact.

¶ 65    But we are unwilling to take *de novo* review any further than that, and defendant has cited no case law that would support our doing so. As one might expect in the appraisal of property, within each of those three valuation methodologies, there are various choices appraisers must make—which kinds of sales to compare, for example, or how to capitalize income—and we will not subject every choice an expert makes to *de novo* review, simply because defendant refers to each of those choices as "methodology." We have never done so, and indeed, doing so would subject virtually the entire case to *de novo* review. Indeed, we fully agree with the following statement defendant makes in her brief: "a party's objection to the testimony of an

- 10 -

opposing expert on the basis that the expert's testimony includes improper elements or adopts a different theory of valuation goes to the weight, rather than the admissibility, of that testimony." See, *e.g.*, *In re Village of Bridgeview, Cook County, Illinois, Special Assessment*, 139 Ill. App. 3d 744, 749-50 (1985) (village's objection to expert's consideration of median household income, as one factor in computing residential property value, went solely to weight of testimony).

¶ 66    For example, in *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 44, Kraft argued that the Property Tax Appeal Board (PTAB) used the wrong kind of comparable sales—leased-fee, bulk-sale transactions, not listed on the open market—when employing the favored sales comparison analysis. Kraft argued that this was an attack on the "proper methodology" for the valuation of the property and thus required *de novo* review. *Id.* We rejected the application of *de novo* review, reasoning that the sales comparison approach was, in fact, used—the expert claimed that these sales reflected actual market value—and thus Kraft's argument was not the *absence* of a sales comparison approach but simply an attack on *how the expert employed it*. *Id.* ¶ 46. That argument, we held, was simply an attack on the weight the fact finder should have given to the testimony, properly reviewed under the manifest-weight standard. *Id.*

¶ 67    With the standard of review clarified, we turn to the various challenges defendant raises to the "methodology" employed by plaintiff's expert, Enloe.

¶ 68                    B. Lack of Reproduction Cost Approach

¶ 69    First, defendant argues that plaintiff's expert, Enloe, failed to use the reproduction cost approach. Though we have typically only seen *de novo* review when determining whether the sales comparison approach was properly disregarded, it is fair to say that the reproduction cost approach is one of the three methodologies recognized in Illinois for valuing property. See *id.* ¶ 43. Thus, because this challenge is truly an attack on "methodology," we will review this challenge *de novo* out of an abundance of caution.

¶ 70    We find no error, however. Enloe used the sales comparison approach, the preferred approach under Illinois law because it relies on actual sales data. See *id.* He placed the most weight on the income capitalization approach, which is particularly suited to a valuation of the property in question here—a multi-tenant commercial property—because that approach is based "on the property's income-producing potential." *Id.*; see also *United Airlines*, 348 Ill. App. 3d at 566 ("The income capitalization approach is used when the property is most valuable as rental property."); *Ellsworth Grain Co. v. Illinois Property Tax Appeal Board*, 172 Ill. App. 3d 552, 557-58 (1988) (market value may be reflected by using an income formula where the property is rented or rentable). Defendant's expert, Jackson, employed each of these methods, as well.

¶ 71    Though Enloe failed to use the reproduction cost approach and defendant's expert, Jackson, did use it, Jackson himself stated that he placed almost no weight on it because he did not consider it to be appropriate for this property. Jackson was correct to place little weight on that method in this case, and we find no error in Enloe's exclusion of that method altogether.

¶ 72    The reproduction cost method "focuses on what it would cost to recreate the property with the same value." *United Airlines*, 348 Ill. App. 3d at 566; see also *Willow Hill Grain, Inc. v. Property Tax Appeal Board*, 187 Ill. App. 3d 9, 14 (1989). That method "should be emphasized only in the context of some special-purpose property, which is defined as property of such a nature and applied to such a special use that it cannot have a market value." *Kraft*

*Foods*, 2013 IL App (2d) 121031, ¶ 43; see also *Chrysler Corp.*, 69 Ill. App. 3d at 212. This law has been settled for over a century. See *City of Chicago v. Farwell*, 286 Ill. 415, 420 (1918) (generally, reproduction cost should be emphasized only in the context of some special purpose property, which is property "of such nature and applied to such special use that it cannot have a market value").

¶ 73　　One example is railroad property; our supreme court approved the use of the reproduction cost approach as one—but not the only—method of valuing such property because "the concept of market value [had] little practical application," given that "railroads [were] not bought and sold on the market." *People ex rel. Hillison v. Chicago, Burlington & Quincy R.R. Co.*, 22 Ill. 2d 88, 101 (1961); see also *Kendall County Board of Review*, 337 Ill. App. 3d at 741 (replacement cost method was appropriate for property zoned for agricultural use with special-use permit for telecommunications; evidence showed no actual or potential market). Thus, when a property is of such unique nature that its market value literally cannot be quantified, an appraiser may resort to the reproduction cost method. See *Willow Hill Grain*, 187 Ill. App. 3d at 14-15 (replacement cost method should be used "only when there is no actual or potential market for the property in question, and even then it should be only one factor in the valuation process and not the sole, conclusive method of valuation"); *Chrysler Corp.*, 69 Ill. App. 3d at 212-13 ("[t]he key" to use of reproduction cost method "is whether the property is in fact so unique as to not be salable").

¶ 74　　But "[h]eavy reliance upon the reproduction cost method of valuation has been frowned upon by the courts" (*Chrysler Corp.*, 69 Ill. App. 3d at 211) because most properties, even unique ones, have some actual or potential market value. See, *e.g.*, *Willow Hill Grain*, 187 Ill. App. 3d at 15 (grain facility, though unique, had comparable sales comparisons and thus, "reliance on the replacement cost method of valuation in the instant case was error"); *Chrysler Corp.*, 69 Ill. App. 3d at 211-15 (automobile assembly plant was not so unique as to preclude sales comparisons, and thus reliance on reproduction cost method was reversible error); *United Airlines*, 348 Ill. App. 3d at 572 (though "rental of an airport terminal may be considered property of special use," sales comparisons were available, and thus it was error to rely on reproduction cost method over sales comparison approach).

¶ 75　　Here, there is no question that a market exists for the property in question; each of the experts so testified and produced comparable sales for consideration, and each of them used the sales comparison approach to buttress their income capitalization methods. Thus, heavy reliance on the reproduction cost method would have been obviously inappropriate, as defendant's expert, Jackson, himself admitted. We are not suggesting that it was error for Jackson to include the reproduction cost method along with the sales comparison and income capitalization methods. These methods are all estimates, and they serve as a check on each other. But neither could we possibly hold that Enloe's exclusion of that method was a flaw in his methodology, much less one that was sufficient to warrant reversal. We find no error here.

¶ 76　　　　　　　　　　　　C. Use of Fee-Simple Valuation

¶ 77　　Defendant next argues that Enloe did not, in fact, use the sales comparison approach because he improperly used a leased-fee valuation of the comparables instead of a fee-simple valuation. (In other words, Enloe used sales comparables that were multi-tenant buildings with existing leases.) Of course, as we have said, the failure to use a sales comparison approach in a

case such as this one, where a market for the Property clearly exists, would be reversible error. See, *e.g.*, *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 43; *United Airlines*, 348 Ill. App. 3d at 572.

¶ 78     But that is not the case here. Enloe clearly conducted a sales comparison analysis. He testified about it at length during trial. He included it in his written valuation report. Defendant even cross-examined him about the veracity of his sales comparables at trial. Defendant is simply arguing that Enloe used the wrong kind of comparables. As we discussed above, that is precisely the argument Kraft made in *Kraft Foods*, 2013 IL App (2d) 121031, ¶¶ 44, 46—that the expert used the wrong comparables—and we recognized this alleged attack on "methodology" for what it was, a challenge to the weight the fact finder should have given to the expert's choice. Just as we reviewed that question under the manifest-weight standard, so too will we review defendant's challenge here under that standard.

¶ 79     The thrust of defendant's argument seems to be that only a fee-simple valuation can produce a fair market value. We do not find this contention supported by the law, the expert testimony, or the trial court's finding at trial. Enloe testified that the only difference between fee-simple and leased-fee valuations is the existence of leases on the comparable properties at the time the interest is valued; he testified that both are market valuations of the property. The trial court accepted this testimony, making a written finding that Enloe used "realistic comparables" in arriving at his conclusion.

¶ 80     Of course, defendant's expert, Jackson, disagreed with Enloe, but it was up to the trier of fact to settle the competing expert contentions, and it did just that. We have been cited no authority for the proposition that a leased-fee valuation in this context is so glaringly inappropriate that we must overturn the trial court's acceptance of it. We cannot say that the opposite conclusion was clearly evident.

¶ 81                           D. Prospective vs. Retrospective Analysis

¶ 82     Defendant next complains that Enloe's analysis was faulty because it was prospective in nature, not retrospective like Jackson's. Recall that Enloe did not enter the picture after a tax objection was filed and litigation proceeded; he was hired by a bank in late 2011 to appraise the Property for loan underwriting purposes, and plaintiff bought the Property shortly thereafter, in January 2012. Obviously, to protect its interests before lending millions of dollars to a borrower, the bank would have been interested in the then-current fair market value of the Property as well as the projected fair market value of the Property going forward. That is what Enloe did: he valued the Property as of December 2011 and then projected the value for December 2013 and December 2014.

¶ 83     It is worth noting here that plaintiff did not principally rely on those future valuations at trial but focused on the December 2011 valuation. And contrary to defendant's characterization, the December 2011 valuation was not prospective. It gave the then-current fair market value based in part on previous sales of comparable properties. We are not sure how that could be considered "prospective" in any sense of that word. But on the other hand, it is true that the value did not go back to the date of January 1, 2011. So perhaps in that sense, it was not wholly retrospective, either, with regard to the valuation of the Property for the tax year 2011—the question in this case.

¶ 84     Regardless, the trial court preferred Enloe's analysis because it reflected the value of the Property contemporaneous with the arm's-length sale—that it "existed at the relevant point of reference for loan underwriting" purposes and thus exhibited "no bias," as opposed to the

analysis by Jackson, who came to this matter in 2014 for the purposes of litigation and "attempt[ed] to artificially reconstruct a valuation from 2011" that the trial court found "not as useful or reliable."

¶ 85　　We cannot say that the trial court's conclusion was so unsupported or faulty that the opposite conclusion was clearly evident. First, it would have been perfectly sensible for the trial court to reason that Enloe would have no bias—no reason to *undervalue* the Property for the bank. The very reason a bank orders an appraisal on property is to ensure that the purchase price matches or at least roughly matches the property's actual value.

¶ 86　　Second and more importantly, consider again that over and above all methodologies used to *estimate* a property's value, the best and "practically conclusive" evidence of a land's value is an actual, recent purchase of that property in an arm's-length transaction. *Korzen*, 37 Ill. 2d at 161; *Omni*, 384 Ill. App. 3d at 480; *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 43. We would utterly contradict that principle if we then turned around and rejected a valuation of the property that supported that very purchase.

¶ 87　　Defendant has provided no support, other than her expert's criticism, for the proposition that the December 2011 appraisal should be rejected. The trial court heard that criticism and decided, instead, that it found Enloe's valuations to be more credible and persuasive. That finding was not against the manifest weight of the evidence.

¶ 88　　　　　　　　　　　　E. Valuation as of January 1, 2011

¶ 89　　Related to the argument we just addressed is defendant's contention that, as a matter of law, Enloe's December 2011 valuation was deficient because it did not establish a market value as of January 1, 2011. Defendant couches this as a basis for a directed verdict in this case. We already explained that we can find nothing in the record showing that defendant moved for a directed verdict on this basis. Defendant orally moved for a directed verdict—saying that and nothing more—and the court denied it—saying that and nothing more. *Supra* ¶ 22. Defendant has not cited to the record for a written motion for directed verdict, nor have we located one. In any event, for the reasons that follow, we reject the contention.

¶ 90　　Defendant relies on the fact that taxing status is determined as of January 1 (see *In re Application of Rosewell*, 120 Ill. App. 3d 369, 373 (1983)), that the owner, as of January 1 of the tax year, is the one who is liable for the taxes (see *First National Bank of Highland Park v. Mid-Central Food Sales, Inc.*, 129 Ill. App. 3d 1002, 1005 (1984)), and that the tax lien attaches as of January 1 of the taxing year (see 35 ILCS 200/21-75 (West 2016)).

¶ 91　　But none of those sources remotely suggests that a valuation of property must be made effective the first day of that tax year. And to suggest otherwise is, again, to ignore the bedrock principle that the best and nearly conclusive evidence of a property's value is a recent, arm's-length sale. The law, quite obviously, does not favor only arm's-length sales that occur on precisely the first day of the relevant tax year. There is nothing magical about January 1.

¶ 92　　Pursuant to the objection statute, the objector's burden is to "show[ ] [that] an assessment [is] incorrect or illegal" by clear and convincing evidence. *Id.* § 23-15(b)(3). Plaintiff did that, in the trial court's view, based in part on an appraisal in December 2011 that supported an arm's-length sale of the Property. Nothing in that statute, or in any other, requires a specific effective date of the valuation.

¶ 93    Plaintiff made an offer on that Property in the middle of the relevant tax year—2011—and Enloe appraised the Property for the lending bank later in that same tax year. Plaintiff bought the Property less than a month into the following year. To suggest that the December 2011 valuation should be rejected out of hand—as a matter of law—is simply not credible.

¶ 94    The fact that Enloe's valuation was made in December 2011 merely went to the weight of his testimony. Defendant was free to attack the December 2011 valuation, as she did. Defendant could certainly have pointed out, if it was possible to do so, that some reason existed why there should be a material difference between the valuation of the Property in December 2011 versus January 2011. Of course, we would never foreclose the possibility that some major intervening event might substantially change a property's value mid-year—say, for example, the collapse of the mortgage industry in 2007, or the September 11, 2001, attacks on our country, to name a few recent events that prompted economic strife—and nothing prevented defendant from making such an argument. But we saw nothing of that nature in this case. Absent that, we can think of no reason, nor has defendant given us one, why a valuation that supported a recent, arm's-length sale could be so unreliable that we would say, as a matter of law, that we must reject it. See *Chrysler Corp.*, 69 Ill. App. 3d at 215 (fact that appraisals for property were from previous tax year (1971) than one at issue (1972) did "not render them meaningless," given lack of any evidence of "significant improvements that might affect the value made to the property during the year in question").

¶ 95                                    F. Discounted Cash Flow Analysis

¶ 96    Defendant next contends that Enloe's employment of the income capitalization methodology was flawed because he used the discounted cash flow analysis, rather than the direct capitalization approach, in valuing the property. We review this question, as well, under the manifest-weight standard. See *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 46.

¶ 97    "Appraisers use a [discounted cash flow] analysis to estimate the value of income-producing property that does not have a stabilized stream of income. [Citation.] Generally, a [discounted cash flow] analysis is based on the principle of anticipation, forecasting the annual cash flows expected over the holding period, and discounting those cash flows at a required rate of return to derive an indication of present value." *Equitable Life Assurance Society of the United States v. County of Ramsey*, 530 N.W.2d 544, 549 (Minn. 1995).

¶ 98    The discounted cash flow analysis predicts future income streams, which Enloe testified was appropriate here, given that the Property was an income-producing property with lease turnover. As he described it:

        "So we analyzed the leases in place, but in looking—you know, analyzing this, given the amount of vacancy we performed a discounted cash flow where we projected that the vacant space would lease-up. And really the discounted cash flow which factors in lease-up of vacant spaces, the associated cost with re-tenanting the building, *i.e.*, tenant improvements, free rent, leasing commission and the lease-up of the property, you know, the discounted cash flow is the method that a buyer would rely on in making a purchasing decision."

¶ 99    Enloe acknowledged that, in utilizing the accepted income-capitalization methodology in tax appraisals, another approach—the direct capitalization approach—is used more often than the discounted cash flow analysis, but he had seen the discounted cash flow analysis used in

tax appraisals, too. He testified that the discounted cash flow analysis was an accepted and typical approach in utilizing the income-capitalization methodology, including in tax appraisals.

¶ 100 Defendant's expert, Jackson, likewise stated that the discounted cash flow analysis "has its place in the income capitalization approach." But he criticized its use in tax appraisals because, he said, one of the costs it takes into account is property taxes—which in Jackson's view made the analysis circular.

¶ 101 That strikes us as a perfectly reasonable criticism of the use of the discounted cash flow analysis in tax appraisals. But it does not follow that an imperfection in the analysis requires us to reject the analysis as a matter of law. Defendant cites no support for that principle. The parties have cited no Illinois decision on point, nor have we found any. Indeed, plaintiff directs us to two decisions from state supreme courts that upheld the use of the discounted cash flow analysis in determining the valuation of real property for taxation purposes. See *Wheelabrator Bridgeport L.P. v. City of Bridgeport*, 133 A.3d 402, 418 (Conn. 2016) ("the trial court improperly rejected the discounted cash flow approach to valuing the property for tax assessment purposes as a matter of law"); *Equitable Life Assurance Society*, 530 N.W.2d at 554 ("the court did not abuse its discretion in determining the market value of the subject property based solely on a [discounted cash flow] analysis.").

¶ 102 So we are in no position to reject the discounted cash flow analysis as a matter of law. Rather, the criticism of this approach offered by defendant's expert was relevant to the weight of Enloe's testimony and analysis. The trial court heard it, digested it along with all of the other evidence, and ultimately sided with plaintiff. We cannot find that the opposite conclusion was clearly evident.

¶ 103 CONCLUSION

¶ 104 We have tried to cover everything in defendant's somewhat meandering account of errors that occurred at trial. We have given careful consideration to every issue raised that could remotely rise to the level of reversible error. The trial court heard all of the evidence and found Enloe more credible than Jackson for the reasons we have outlined. But it is also fair to say that the trial court was moved primarily by the fact of the arm's-length sale of the Property that occurred during and just after the end of the relevant tax year, ultimately determining that the fair market value of the Property was precisely the amount of that sale. The law supports the trial court's judgment in both of those determinations.

¶ 105 Having reviewed each claim of error and having found none, and finding the trial court's judgment well supported by the record, we affirm the judgment.

¶ 106 Affirmed.