No. 2-24-0329
Opinion filed September 25, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PASSCO MELLODY FARM DST TRUST, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 21-TX-26 |
| | ) | 22-TX-671 |
| | ) | |
| HOLLY KIM, In Her Official Capacity as | ) | |
| Lake County Treasurer and *ex officio* County | ) | |
| Collector, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| (The Village of Vernon Hills and Libertyville | ) | Honorable |
| Community High School District No. 128, | ) | Luis A. Berrones, |
| Intervenors-Defendants-Appellants). | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice Kennedy and Justice Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff, Passco Mellody Farm DST Trust, filed a tax objection complaint in the circuit court against defendant, Holly Kim, Lake County Treasurer and Lake County Collector, challenging the validity of the 2020 and 2021 assessed values of its Vernon Hills luxury apartment complex. 35 ILCS 200/23-10, 23-15 (West 2020). After a bench trial, the circuit court entered judgment in plaintiff's favor. Intervenors-defendants (defendants), the Village of Vernon Hills and Libertyville Community High School District No. 128, appeal, arguing that the court erred in

determining that: (1) the township assessor illegally increased the property's assessed values for the 2020 and 2021 tax years, (2) the Lake County Board of Review (Board) did not exercise its discretion in rendering no change determinations, and (3) valuation was not at issue for the 2020 and 2021 tax years. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3                    A. Assessments and Board of Review Proceedings

¶ 4      The property at issue, commonly known as the Atworth at Mellody Farms (the Atworth), is located at 1111 North Milwaukee Avenue in Vernon Hills (permanent index No. 11-34-302-003), and consists of 260 apartment units (16 studio, 137 one-bedroom, 81 two-bedroom, and 26 three-bedroom apartments).

¶ 5      The 2019 tax year was a quadrennial reassessment year in Lake County. Board rules provided that all property values in every township were to be reviewed and revalued, if necessary, and, aside from substantial cause, 2019 assessed values from the general assessment were expected to be carried forward through 2022, subject to annual equalization.

¶ 6      Peggy Freese, the Libertyville Township assessor at the beginning of 2019, valued the Atworth at $51,606,071 for the 2019 tax year and used an income approach (*i.e.*, determining value by dividing net operating income by the capitalization rate). Christine Feeney, Freese's successor, reviewed the Atworth's property record card on July 17, 2019, and "posted" into the assessor's system the assessed base value of the property, specifically, $17,200,303, or one-third, of the $51,606,071 market value. For the 2019 tax year, the Lake County supervisor of assessments (*i.e.*, the chief county assessment officer) issued a township-wide multiplier of 1.0053, which raised the market value of the Atworth to $51,879,582 and the assessed value to $17,291,465. The 2019 assessment was not a partial assessment.

¶ 7 On September 19, 2019, Feeney certified to the chief county assessment officer that the 2019 assessment of real property in Libertyville Township, including the Atworth assessment, was a just and equal assessment of those properties. The former owner of the property filed an appeal of the 2019 assessed value to the Board. Feeney submitted evidence to the Board in the appeal in January 2020, asking the Board to confirm the 2019 assessment of the Atworth. The appeal was subsequently, on February 10, 2020, withdrawn. On December 30, 2019, plaintiff purchased the Atworth for $90.42 million.

¶ 8 The 2020 tax year was not a general assessment year for Lake County. Board rules provided that assessed values from 2019 were generally carried forward through 2022. Revisions and corrections to individual assessments could be made if the 2019 quadrennial assessment was incorrect or to reflect changes made to properties and/or by equalization, as deemed necessary. *Id.* § 9-75.

¶ 9 Feeney increased the assessed value of the Atworth in 2020, using an income approach to value the property. The analysis rendered a market valuation of $71,180,164 and an assessed value of $23,724,348. The supervisor of assessments established an equalization factor of 1.0096 for Libertyville Township for the 2020 tax year, which resulted in a market value of $71,863,495 for the property, with a certified assessed value of $23,952,103. The assessment notice listed as a reason for the 2020 valuation change "Township Revaluation/SA Equalization." The 2020 assessment of the property was not a partial assessment.

¶ 10 Plaintiff paid the 2020 real estate taxes for the Atworth and appealed the $23,952,103 assessed value to the Board. *Id.* § 16-55. Feeney provided evidence to the Board and stated that "[t]he speed of [*sic*] which the property was leased, the subject's sale, and the subject's reported $4,250,000 [net operating income] for 2019 (yielding a 5.0% cap[italization] rate) was reason to

review this property's assessment." Following a hearing, the Board made a "No Change" decision and confirmed the $23,952,103 2020 assessed value (which resulted in a 2020 tax amount of $2,147,645.92).[1] Plaintiff paid the taxes under protest.

¶ 11    For the 2021 tax year, the Atworth's assessed value was raised by the annual township multiplier of 1.0171, resulting in a $24,361,684 equalized assessment. Plaintiff paid the $2,226,487.62 tax amount and appealed the 2021 assessed value to the Board. The Board issued a "No Change" decision, confirming the 2021 assessed value.

¶ 12                    B. Circuit Court Proceedings

¶ 13    On November 17, 2021, plaintiff filed a tax objection complaint for the 2020 tax year and, on January 6, 2023, filed a consolidated amended tax objection complaint, consolidating its objections for both the 2020 and 2021 tax years. *Id.* §§ 23-10, 23-15. In counts I and III, plaintiff alleged that the assessed valuations of the property were made without statutory authority and were, therefore, illegal and warranted correction. It asserted that the township assessor was only permitted to "revise and correct" assessments in non-general reassessment years. *Id.* § 9-75. The assessor, according to plaintiff, had attested to the correctness of the 2019 assessment for the property; thus, the assessor acted unlawfully when she raised the 2020 and 2021 assessed values of the property. Further, in counts II and IV, plaintiff alleged that the 2020 and 2021 assessments of the property were not determined in the same manner as other similar properties in the township, creating an unlawful assessment that violated the uniformity clause of the Illinois Constitution. Ill.

---

[1]If the 2019 assessed value had carried over to 2020 and only the equalization factor had been applied, plaintiff's 2020 taxes would have been based on a final 2020 assessment of $17,457,463. The taxes for the property would have been $582,336.64 lower than what plaintiff paid.

Const. 1970, art. IX, § 4.[2] Plaintiff asserted that the assessor reassessed the property due to the sale price, the speed at which the property was leased, and the reported net operating income on a database (*i.e.*, CoStar) report. The assessor, according to plaintiff, did not raise the assessed value of other similarly situated properties within the township by revaluing them. Thus, the 2020 and 2021 assessments were illegal. On May 25, 2022, defendants were granted leave to intervene. 735 ILCS 5/2-408(a)(3) (West 2022).

¶ 14                    1. Plaintiff's Case—Robert Gluekert

¶ 15    A hearing commenced on July 31, 2023. Robert Gluekert, supervisor of assessments and chief county assessment officer for Lake County since May 2019, testified that 2020 was the first full tax year he served in his position. Property tax notifications are known as blue slips. The year 2019 was a quadrennial (or general) reassessment year for Lake County, and 2020 was a non-quadrennial year. Once every four years, assessors must review all properties and make adjustments as they see fit. In non-quadrennial years, the rules are different. Typically, the 2019 assessments carry over to 2020, plus or minus any township factor (which is determined based on a three-year average of assessments). The level of assessments must be set at 33⅓% of market value. Gluekert reviews the three-year averages and equalizes them; this is "SA" equalization, which occurs annually. Township equalization is reflected on the blue slip and can happen in non-quadrennial years and is applied by the township assessor to a particular assessment neighborhood.

¶ 16    The Atworth was revalued between 2019 and 2020. Board guidelines provided that tax year 2020 was not a general assessment year for the county, and assessed values from 2019 were generally carried forward through 2022. Revisions and corrections to individual assessments could

---

[2]Uniformity is not at issue in this appeal.

be made if the 2019 quadrennial assessment was incorrect or to reflect changes made to the property and/or by equalization, as deemed necessary.

¶ 17　Gluekert explained that a correction remedies a material mistake in the assessment of the property itself, not to include value. Changes to the property include an expansion, additional square footage, or physical changes. It does not refer to any changes to valuation. A correction does not refer to a sale or lack of a sale. Gluekert had no opinion as to whether the 2019 assessment for the Atworth was correct when it was made in 2019. When asked if there were any material changes to the Atworth that would be taken into account for a 2020 valuation, he responded that he did not report any changes in material differences in the property in the State returns he filed.

¶ 18　Once he became aware of the lawsuit, Gluekert spoke to Feeney, because he was concerned as to whether the valuation change was an equalization or a revaluation. He told Feeney that he was concerned that the basis for her revaluing the property was not just. Gluekert still has concerns about the validity of the change in value.

¶ 19　Gluekert further testified that, if a valuation during a quadrennial assessment is incorrect—not due to any change in the property but if the valuation is objectively wrong as of that date—that could be a basis for a revision and correction.

¶ 20　　　　　　　　　　　　　　2. Christine Feeney

¶ 21　Christine Feeney testified that she became the Libertyville Township assessor in June 2019 after Freese retired. When asked if the Atworth's 2019 assessment was correct, Feeney replied "Yes and no." (She conceded that she testified at her deposition that the value was correct, *i.e.*, a fair market value for the property at that time (*i.e.*, January 1, 2019)). The valuation was not incorrect, and it was fair. On September 19, 2019, she certified to the chief county assessment officer that the 2019 assessment of real property in Libertyville Township, including the 2019

Atworth assessment, was just and equal. Feeney testified that, in the 2019 appeal of the Atworth's assessment before the Board, she asked that the assessment be confirmed. She noted that the property appeared to be underassessed, but she did not say it was incorrect or ask the Board to revise and correct the number. At that time, she was aware of information in the CoStar database reflecting a sale of $90,420,000 on December 31, 2019, and although she could have asked the Board to increase the 2019 assessment for the property, she did not because she felt the $54 million assessment was fair. "It was a new construction building, still in its leasing-up phase." Feeney never asked the Board to make a revision and correction to the 2019 assessment.

¶ 22    Addressing the 2020 tax year, Feeney testified that it was a non-quadrennial year, and she revised and corrected the assessed value for the property. She explained that a blue slip is an assessment notice that is mailed to all property owners that shows their current assessment and any changes that have been made to it. If there is a valuation change, the blue slip lists the reasons for it. The 2020 blue slip for the Atworth listed as a reason for the 2020 valuation change "Township Revaluation/SA Equalization."

¶ 23    In valuing the property for 2020, Feeney used an income approach, and she valued the property as of January 1, 2020. She calculated a market value of $71,180,164. There was an appeal of the 2020 assessment, and she submitted evidence to the Board as part of the appeal. There, she expressed her reasons for the 2020 valuation, including that the property's January 1, 2019, assessment was an underassessment. Feeney did not want the 2019 value carried to 2020, because it would be incorrect. The speed with which the property was leased, the sale, the reported $4.25 million net operating income for 2019 (yielding a 5% capitalization rate) were reasons to review the property's assessment and value it as of January 1, 2020. Due to all of those factors, which she conceded were not available on January 1, 2019, and not relevant to the 2019 value, the initial

assessment in 2019 was "clearly incorrect." (She obtained the information from the CoStar database report printed on April 20, 2020.) The occupancy rate for the Atworth increased from 51.2% to 97% in 2019. This was a factor in Feeney's decision to increase the assessed value of the property. She revalued the property in 2020 because the value increased between January 1, 2019, and January 1, 2020.

¶ 24 There was no income stream provided as of January 1, 2019. The income stream used for the 2020 assessment was based on what it was on January 1, 2020. In 2020, there was no physical square footage added to the Atworth, but there were more apartments that were finished.

¶ 25 Addressing 2021, Feeney testified that the 2020 assessment carried over to 2021 and was subject to equalization. The 2021 assessment was appealed, and she submitted evidence to the Board for the appeal.

¶ 26 On cross-examination, Feeney testified that the 2019 assessment that Freese conducted did not involve the same information that was available to Feeney. If Freese had that information, the assessment as of January 1, 2019, would have been incorrect.

¶ 27 As part of her income and expense analysis of the property, Feeney used information the Atworth provided in April 2020, including the rents, parking charges, rooftop parking, pets, application fees, etc. The property provided Feeney the amount they charged for parking (at the indoor garage and for rooftop parking) and the number of parking spaces per unit; she estimated the income from these sources and from floor plans of the complex. Feeney identified $500,000 in "other income," whereas Freese calculated $12,000. This led to a large difference in market valuation. Feeney estimated rent to be $6,749,832. She used 40% for expenses, which was "lenient." Feeney also used a capitalization rate of 5.5%, versus 7% used by Freese. For net operating income, Feeney used $3.914 million, as opposed to $4.25 million from CoStar, to be

lenient to the property owner because the first year could have involved certain items that drove up income, such as application fees and first and last months' rents. She calculated a market value of $71,180,164.

¶ 28    Feeney next addressed the capitalization rate, noting that guidelines for the tax year 2020 had suggested rates for three types of properties: institutional-grade properties, non-institutional-grade properties, and local properties. The Atworth is an institutional-grade property. The suggested ranges for the capitalization rate for apartment buildings was 4.75% to 5.75%. Feeney reviewed the suggested ranges and conducted her own research and chose 5.5%; Freese used 7%.

¶ 29                                        3. Martin Paulson

¶ 30    Martin Paulson, former chief county assessment officer for Lake County (2003 to May 2019), testified as plaintiff's expert in real estate assessments for property tax purposes and opined that the 2019 assessment was reasonably performed and that the market value of $51 million assessed by Freese was reasonable and correct, as was her use of a 7% capitalization rate. (Net operating income is divided by the capitalization rate to arrive at fair market value.) The capitalization rate was appropriate because (1) the building was just starting to lease and, thus, there was risk, and (2) interest rates had increased. Paulson also opined that the 40% expense ratio was appropriate in his experience because the property at that time had no track record, *i.e.*, no history of expenses. During a new-build phase, he explained, there are inefficiencies.

¶ 31    The property record card for the 2019 assessment reflected that Freese wrote that the capitalization rate was derived from sales of other apartment complexes. This was an appropriate method, in Paulson's experience. As part of his analysis, Paulson reviewed a well-respected nationwide investor survey that compiled capitalization rates and other financial information. For the first quarter of 2019, the report stated that the average rate for all apartments was 8.73%. This

influenced his opinion that a 7% capitalization rate was appropriate. Also, the Atworth was leasing up in 2019, which meant it had a great deal of risk. Paulson did not consider the Atworth an institutional grade property as of January 1, 2019. He also reviewed the CoStar database, which showed a capitalization rate range of 5% to 7%. The assessor, he explained, has discretion in terms of making a value estimate, *e.g.*, Freese's conclusion of what she felt the property was worth as of January 1, 2019.

¶ 32    Plaintiff rested.

¶ 33                          4. Defendant's Case—Peggy Freese

¶ 34    Freese testified that she became the Libertyville Township assessor in 1998 and retired from that position on June 4, 2019. Prior to retirement, Freese conducted all 2019 tax year assessments, signed off on them, and forwarded them to the chief county assessment officer.

¶ 35    The Atworth received its final certificate of occupancy on February 1, 2019. Apartment complexes can take in residents before they receive final certificates of occupancy, which is what occurred at the Atworth. The property is a higher-end luxury apartment complex and one of the largest value apartment complexes in Lake County.

¶ 36    Freese used an income approach to value the property. She also attempted to inspect the property on May 20, 2019, to obtain rent, occupancy, "other income," and additional information. She spoke to the manager; however, she was not allowed to inspect the property, nor given any rental information. She merely learned that the property was 81% occupied. Freese had sought to inspect any outbuildings, such as garages, review a floor plan, and view the exercise room, laundry room, etc. She was allowed only in the manager's office and front lobby. She left her business card with the manager, but no one from the property contacted her afterwards. Generally, Freese explained, she was able to inspect only about 50% of properties.

¶ 37    In her assessment of the Atworth, Freese used median rent, *i.e.*, rents of similar properties, because she did not have the actual rental data for the Atworth. It was unusual not to receive this information from a property. For the Atworth, she did not break down studios and one-bedroom units because she did not have that information. Addressing "other income," Freese used $12,000, noting that her estimate was on the low side (as she did not have actual figures and the property did not provide the information when she asked for it) and included pets, garage, room rentals, etc. Freese used $12,000 for "other income" so that it could be reviewed in another tax year as far as revision and correction.

¶ 38    Freese attempted to complete a full assessment of the property. The vacancy collection number she utilized was 10%, which reflected that she conducted a full assessment. Expenses were listed at 40%, which is typical for apartment buildings (and she did not have actual expense data) and a generous number to the property owner. Freese calculated $3,612,425 in net operating income and a 7% loaded capitalization rate (which assumes that taxes are not included in expenses). She made a notation that a property across the street from the Atworth had a 5.3% capitalization rate. She referenced Board capitalization rate guidelines, but explained that "we do not necessarily use the exact numbers."

¶ 39    Ultimately, Freese calculated a market value of about $51.6 million for the Atworth as of January 1, 2019. The Atworth was institutional grade property as of January 1, 2019. She was not able to obtain actual data from the property owner, but she believes the value was very conservative, *i.e.*, in the owner's favor. It was low so that she could defend it if it was challenged. Freese further testified that, if she had received actual data from the property, her calculations, including of market value, could have been different.

¶ 40                                     5. Martin Kinczel

¶ 41     Martin Kinczel, chief real estate appraiser for the Lake County assessor's office, reviews assessments of property, focusing on commercial and industrial properties. He is also involved in responses to appeals on behalf of the Board. Kinczel reviewed the 2019 analysis for the Atworth and the 2020 and 2019 income and expense analyses. The Atworth is an income-producing property, and it is appropriate to use the income approach to determine its market value. The 2019 analysis utilized a direct capitalization approach. It is appropriate and preferred to have actual data from the property owner before conducting an income and expense analysis. However, in making assessments, assessors use estimates and have latitude to revise and correct when an estimate differs from actual data.

¶ 42     If there are studio apartments in a building, it is proper to parse them out from one-bedroom units and it is an omission and error to not include them in calculating average rent. Freese's calculation of $12,000 in "other income," he testified, was gross error and incorrect. The property has 450 parking spaces and a pet park. The $12,000 estimate significantly undervalued "other income." More often than not, property owners provide information. Kinczel further testified that 40% for expenses was reasonable and correct. The 7% capitalization rate (assuming it was not loaded) was incorrect because it applied a local capitalization rate for a local apartment complex (*i.e.*, a small mom-and-pop property), where it should have applied a capitalization rate in the range of 4.75% to 5.75% (per Board guidelines). This resulted in a market value for January 1, 2019, that was incorrect.

¶ 43     Addressing 2020, Kinczel testified that the valuation broke out the number of studio apartments, one-bedroom apartments, etc., which was the correct way to conduct the calculations. The capitalization rate of 5.5% was within Board guidelines and appropriate.

¶ 44    Kinczel further testified that Board guidelines for capitalization rates are suggested rates, and the assessor has discretion to use the guidelines. Further, the guidelines are base capitalization rates, not loaded capitalization rates. If the 7% capitalization rate for 2019 was loaded, the base rate would be less than 5%.

¶ 45    If estimates are off from actual data, then the estimate is incorrect. It is an error that can be revised and corrected in the following assessment year.

¶ 46                                6. John Paslawsky

¶ 47    John Paslawsky, a permanent member of the Board since 2020, testified he has worked in real estate appraising since 1978. The Board has three permanent members. He became an alternate Board member in 2008. The Board reviews assessors' work and conducts hearings regarding assessments. Paslawsky chairs a hearing panel.

¶ 48    The income expense approach or direct capitalization approach is used for commercial or income-producing properties. Typically, three years of income are reviewed to derive a sense of year-to-year vacancy, occupancy, and income. Net operating income, which is gross income from all sources minus expenses, is reviewed. It is better to have actual net operating income rather than projected.

¶ 49    The Board has guidelines for capitalization rates that are suggested rates and are based on local and national data. For institutional-grade properties, the capitalization rate range for 2019 for apartments was 4.75% to 5.75%. It was the same range for 2020. Assessors have discretion in setting capitalization rates, and if they choose a rate above the Board's guidelines, the Board does not necessarily correct it but "might question it."

¶ 50    Paslawsky further testified that his understanding of the term "revise and correct" is that any changes in property characteristics or conditions would be researched and considered to have

a more current overview of the property. If the original assessment in the quadrennial year was incorrect, the assessor may revise and correct it in a non-quadrennial year.

¶ 51    Assessors estimate net operating income, vacancy, and collection. An assessor may not revalue a property simply because of a sale.

¶ 52    The property was not complete in 2019, and the Board did not have correct information. This is why the assessor was correct in adjusting the assessment in 2020. The Atworth "was still in the process of being rented up, being completed in 2018. It was not completed until the end of [2019]."

¶ 53    Paslawsky was unaware during the 2020 appeal that the 2019 assessment was not a partial assessment. Feeney did not submit a correction for the Atworth's 2019 assessment for the Board's approval.

¶ 54    The Board considered the market value of the Atworth in the 2020 appeal. The property sold for $90.42 million, the assessor assessed the property at about $70 million, and the Board affirmed the assessment. Paslawsky testified that it was a correct revision of the prior assessment. In reaching her 2019 assessment, Freese did not have correct information. Sales chasing, *i.e.*, using a recent sale to change an assessed value, is prohibited by the Property Tax Code (Code) (35 ILCS 200/1-1 *et seq.* (West 2020)).

¶ 55    The defense rested.

¶ 56                              7. Circuit Court's Ruling

¶ 57    On April 24, 2024, the circuit court, in a written order, sustained the tax objections, finding that the 2020 and 2021 increases were void and entering judgment in plaintiff's favor. However, the court overruled and denied the uniformity clause claims.

¶ 58    As relevant here, the court determined that, to "revise and correct" a general assessment (*id.* § 9-75), an assessor is limited to information that existed during the time that the Code sets forth for the general assessment to be completed. In this case, relevant information was information that existed and was available through June 1, 2019, of the general assessment year (*i.e.*, the deadline that the assessor was mandated to complete all general assessments). *Id.* § 9-155. The court further found that the 2020 assessment was *not* a revision and correction but was a *new* assessment by Feeney, because she believed that the Atworth sold for substantially more than its general assessment and she used data that did not exist when the 2019 assessment was completed. The court noted that Feeney admitted that the information upon which she relied to change the Atworth's assessed value was relevant only to determining the property's value as of January 1, 2020. She "clearly made a new assessment and not a revision and correction to the January 1, 2019, assessment." The court also noted that an "edit list" document listed as a "reason code" for the 2020 Atworth assessment: "Township Revaluation." Another available code that was not listed for the Atworth was "Assessor Correction."

¶ 59    Further, the court found that the 2019 assessment was not incorrect. Freese's characterization of $12,000 in "other income" as low did not render her estimate incorrect, in the absence of other available evidence at the time. The court also found no error in the use of a 7% capitalization rate, noting that the Board's guidelines were not mandatory and that assessors have discretion to deviate from them. It also noted that Paslawsky testified that the Board would not necessarily have changed Freese's categorization of the property as local. The court further found incredible Feeney's testimony that the 2020 assessment was a revision and correction, where no objective evidence was presented that the 2020 assessment was such. The court found that it was a new assessment, where Feeney had certified to the chief county assessor that the property's 2019

assessment was just and equal. Feeney's $500,000 estimate of "other income" was based not on actual figures provided by the property, but her own calculation of rent from parking spaces. However, the court found that she did not verify whether all parking spaces were generating rental income. The court also found that, in both the 2020 and 2021 appeals, the Board did not address the issue of "the illegality of reassessing the Atworth in a non-quadrennial year."

¶ 60       Next, the court addressed whether the township assessor has authority under section 9-160 of the Code to conduct a non-quadrennial year assessment. It found that the testimony was undisputed that the 2019 assessment was a full assessment and not a partial assessment (and section 9-160 applies when a property has not previously been fully assessed) and that there was no evidence that the 2020 assessment was conducted to account for added value to the property arising from the addition of buildings, structures, or other improvements. Next, the court addressed whether the Board may revise an assessment in a non-quadrennial year. It determined that this required that a complaint be filed with the Board by the party seeking a change to an assessment or that the Board on its own motion reconsider an assessment. Here, the court found, neither occurred. Feeney did not file a complaint with the Board or in any way request that the 2019 general assessment be increased before she "unilaterally" reassessed the property and increased the assessment for the 2020 tax year. The court also found that the Board did not exercise its own judgment and increase the assessment for 2020. The Board "merely affirmed Ms. Feeney's illegal and void increase in the Atworth's assessment and [the Board] never exercised its judgment to raise the valuation."

¶ 61       The court ordered defendants to pay plaintiff a $582,336.64 refund in overpaid 2020 real estate taxes, plus interest, and a $603,717.39 refund in overpaid 2021 taxes, plus interest.

¶ 62       Defendants appeal.

¶ 63                              II. ANALYSIS

¶ 64     Defendants argue that the circuit court erred in determining that (1) the township assessor illegally increased the Atworth's assessed value for the 2020 and 2021 tax years, (2) valuation was not at issue in 2020 and 2021, and (3) the Board did not exercise its judgment in determining the value during its hearing.

¶ 65                          A. Standard of Review

¶ 66     Defendants contend that *de novo* review applies here. Plaintiff asserts that the manifest-weight standard applies because the issues concern factual questions, including credibility determinations. For the following reasons, we agree with plaintiff.

¶ 67     Section 23-15 of the Code provides that "[t]he taxes, assessments, and levies that are the subject of the [tax] objection [complaint filed under section 23-10] shall be presumed correct and legal, but the presumption is rebuttable. The plaintiff has the burden of proving any contested matter of fact by clear and convincing evidence." *Id.* § 23-15(b)(2).

¶ 68     In *United Airlines, Inc. v. Pappas*, 348 Ill. App. 3d 563, 569 (2004), upon which defendants rely, the court held that *de novo* review applied to the issue of the appropriateness of the valuation methodology used by the taxpayer's expert in valuing the property interest at issue. Thus, the case instructs that, "when the issue relates to the use of an improper valuation method," *de novo* is appropriate. *Id.* As we discuss below, valuation is not at issue in this appeal. Indeed, in their reply brief, defendants acknowledge that one of the issues in this case is *whether* valuation was at issue below.

¶ 69     We conclude that the manifest-weight standard applies here because this case presents neither valuation nor statutory construction issues and applying that standard is consistent with relevant case law. See, *e.g.*, *Gateway-Walden, LLC v. Pappas*, 2018 IL App (1st) 162714, ¶¶ 27,

60-66 (noting that, in a tax objection proceeding, reviewing courts apply the manifest-weight standard of review to the trial court's factual findings; but courts review *de novo* whether an appraiser properly eschewed the preferred methodology for property valuation; however, courts apply the manifest-weight standard to a ruling on an objection that concerns how an expert applied a valuation method, *i.e.*, whether he considered improper elements or adopted a different valuation theory; such an objection goes to the weight, rather than the admissibility, of the expert testimony); *Golf Trust of America, L.P. v. Soat*, 355 Ill. App. 3d 333, 337 (2005) (applying manifest-weight standard to issue of whether property was improperly reassessed in a non-general-reassessment year).

¶ 70                                     B. Validity of Assessment Increase

¶ 71    Defendants argue that the increased assessments for 2020 and 2021 were authorized by section 9-75 of the Code, where the 2019 assessed value was clearly incorrect. The circuit court, they assert, incorrectly limited the scope of Feeney's determination to information that existed prior to June 2019. Defendants maintain that this determination is too strict and narrow, creating an unworkable approach to property tax valuation, and the circuit court's findings do not comport with the testimony. At the time Feeney concluded that the 2019 assessment warranted revision, the 2019 books were closed and the tax bills were sent out. Any information she gathered for the 2020 tax year, defendants assert, would be after June 2019. Further, any information that was known to the assessor during the quadrennial assessment period would be incorporated into the quadrennial assessment. A revision, defendants contend, likely occurs because new information comes to light *after* the books are closed. Limiting an assessor to information that existed and was available through June 1, 2019, of the general assessment year leads to the situation Freese was

in—stonewalling that prevents access to accurate data and leads to conservative valuations, *i.e.*, valuations that, if challenged, could be defended.

¶ 72    Feeney, according to defendants, used information that was available in 2020, and the only party able to confirm if it existed in 2019 is the party seeking to lower its tax burden. They further maintain that there is no indication that the data Feeney gathered in 2020, such as rental rates, parking fees, etc., varied drastically between 2019 and 2020. The data Feeney received in April 2020 regarding "other income" generated from parking, etc., they assert, objectively shows that the 2019 assessment was incorrect. Further, they assert that the sale for about $40 million above the 2019 assessment less than 12 months after the 2019 valuation date objectively indicates the 2019 assessment was incorrect.

¶ 73    Defendants further argue that the 2019 valuation was objectively incorrect because it did not reflect the actual market value of the Atworth, where there was a lack of actual data due to stonewalling by the property, the incorrect capitalization rate used by Freese (that this court, they argue, can review *de novo* and consider its correctness), and the 2019 value as a full, versus a partial, assessment.

¶ 74    They also argue that, even if a "subjective" test is applied (*i.e.*, affording deference to the assessor), the 2019 valuation was still incorrect because Feeney testified that the assessment was incorrect once additional information was available. If the statute permits an assessor to revise and correct as appears to be just, then a subjective standard, defendants argue, defers to the assessor's ability to determine what is just. Here, they contend, Feeney used her discretion to decide if a revision and correction was needed.

¶ 75    The Code sets forth a comprehensive statutory scheme regulating the assessment and collection of taxes. *Adventure Christian Church v. Blair*, 2022 IL App (3d) 210550, ¶ 13.

"[I]f any person desires to object to all or any part of a property tax for any year, for any reason other than that the property is exempt from taxation, he or she shall pay all of the tax due within 60 days from the first penalty date of the final installment of taxes for that year. Whenever taxes are paid in compliance with this Section and a tax objection complaint is filed in compliance with Section 23-10, 100% of the taxes shall be deemed paid under protest without the filing of a separate letter of protest with the county collector." 35 ILCS 200/23-5 (West 2020).

"Beginning with the 2003 tax year, in counties with less than 3,000,000 inhabitants, the person paying the taxes due as provided in Section 23-5 may file a tax objection complaint under Section 23-15 within 75 days after the first penalty date of the final installment of taxes for the year in question." *Id.* § 23-10.

"A tax objection complaint under Section 23-10 shall be filed in the circuit court of the county in which the subject property is located." *Id.* § 23-15(a). "The court, sitting without a jury, shall hear and determine all objections specified to the taxes, assessments, or levies in question." *Id.* § 23-15(b)(1).

"Objections to assessments shall be heard de novo by the court. The court shall grant relief in the cases in which the objector meets the burden of proof under this Section and shows an assessment to be incorrect or illegal. If an objection is made claiming incorrect valuation, the court shall consider the objection without regard to the correctness of any practice, procedure, or method of valuation followed by the assessor, board of appeals, or board of review in making or reviewing the assessment, and without regard to the intent or motivation of any assessing official." *Id.* § 23-15(b)(3).

¶ 76    "[I]n counties having the township form of government and with less than 3,000,000 inhabitants, the general assessment years shall be 1995 and every fourth year thereafter." *Id.* § 9-215. In general assessment years, on or before June 1, the assessor of a county with fewer than 3 million inhabitants, "shall actually view and determine as near as practicable the value of each property listed for taxation as of January 1 of that year *** and assess the property at 33⅓% of its fair cash value." *Id.* § 9-155.

¶ 77    As to new improvements, the Code provides that, on or before June 1 in each year other than the general assessment year,

> "the assessor shall *** make and return a list of all new or added buildings, structures or other improvements of any kind, the value of which had not been previously added to or included in the valuation of the property on which such improvements have been made, specifying the property on which each of the improvements has been made, the kind of improvement and the value which, in his or her opinion, has been added to the property by the improvements. The assessment shall also include or exclude, on a proportionate basis in accordance with the provisions of Section 9-180, all new or added buildings, structures or other improvements, the value of which was *not* included in the valuation of the property for that year, and all improvements which were destroyed or removed." (Emphasis added.) *Id.* § 9-160.

¶ 78    Revisions and corrections are addressed in section 9-75 of the Code, which provides:

> "The chief county assessment officer of any county with less than 3,000,000 inhabitants, or the township or multi-township assessor of any township in that county, *may in any year revise and correct an assessment as appears to be just*. Notice of the revision shall be given

in the manner provided in Section 12-10 and 12-30 to the taxpayer whose assessment has been changed." (Emphasis added.) *Id.* § 9-75.

¶ 79    "[A]n assessor does not have the authority to revise *or* correct; such an adjustment can be made only to cure an incorrect assessment from the quadrennial year or to reflect changes made to the property." (Emphasis in original.) *Golf Trust of America*, 355 Ill. App. 3d at 336; see *Albee v. Soat*, 315 Ill. App. 3d 888, 891 (2000) (where the collector admitted that the quadrennial assessment was correct and that the plaintiff taxpayers had not altered or improved their property between the quadrennial and the subsequent non-quadrennial year, section 9-75 did not grant the assessor authority to revise or correct the assessment, as the subsequent non-quadrennial year's assessment was not due to an incorrect assessment in the quadrennial year or to changes made to the property).

¶ 80    Section 9-75 of the Code is clear that, in non-quadrennial years such as 2020 and 2021 for Lake County, an assessor has the power to only revise *and* correct an assessment. Thus, if the reason for the assessment is not due to an incorrect assessment, the assessor does not have the statutory authority to reassess the property in a non-quadrennial year.

¶ 81    The question here is whether Feeney revised and corrected the property's 2019 assessment in 2020 and 2021. The evidence reasonably reflected that Feeney did not correct the 2019 assessment but merely revalued the property (*i.e.*, revised the assessment) for the 2020 tax year. The parties stipulated and Feeney testified that she believed that the 2019 assessment was a fair valuation and assessment. She also testified that the 2019 assessment was correct as of January 1, 2019. Indeed, Feeney posted the property's assessed value on July 17, 2019, and, on September 19, 2019, certified to the chief county assessment officer that the 2019 assessment was a just and

equal assessment of all properties in Libertyville Township. Further, Feeney never asked the Board to revise and correct the 2019 assessment.

¶ 82 Feeney's actions reflected that she revalued the Atworth for the 2020 tax year (as of January 1, 2020) and did not correct the 2019 assessment. Feeney testified that she never asked the Board to revise and correct the Atworth's 2019 assessment. During the 2019 appeal, even though she was aware of the property's sale in December 2019, she did not ask the Board to increase the 2019 assessment, because she felt the $54 million assessment was fair, *i.e.*, it reflected a fair market value of the property as of January 1, 2019. For the 2020 tax year, Feeney testified that she revised and corrected the property's assessment, valuing the property as of January 1, 2020, and calculating a market value of over $71 million. She explained to the Board that she believed the 2019 assessment was an underassessment. Feeney revalued the property in 2020 because the value increased between January 1, 2019, and January 1, 2020. The occupancy rate increased, the net operating income changed, and the property was sold. Feeney also testified that she had more information available to her than Freese did when Freese conducted the 2019 assessment. Paulson, plaintiff's expert, testified that the 2019 assessment was reasonable and correct. Feeney, Paslawsky acknowledged, did not submit a correction for the 2019 assessment for the Board's approval, and an assessor cannot revalue a property solely due to a sale.

¶ 83 Notwithstanding her testimony that she revised and corrected the Atworth's assessed value, which the circuit court reasonably found incredible, the blue slip for the Atworth and the "edit list" reflected that the reason for the 2020 valuation change was a "revaluation" and not a correction. Indeed, before the Board, Feeney explained that the reasons for her 2020 valuation were the speed with which the property was leased, the 2019 sale, and the reported $4.25 million net operating income for 2019 (yielding a 5% capitalization rate). The foregoing evidence was relevant to the

value of the property as of January 1, 2020, as plaintiff argues, but they were not relevant to its value as of January 1, 2019, the date as of which the statute requires the property be valued in the general assessment year. 35 ILCS 200/9-155 (West 2020). Further, Feeney used the income stream during the year 2019 for her valuation as of January 1, 2020.

¶ 84　The foregoing reflects that the circuit court did not err in determining that the 2020 assessment was not a revision and correction of the 2019 assessment. As the court noted, Feeney admitted that the information upon which she relied for the 2020 tax year, including the 2019 sale, was relevant only to determining the property's value as of January 1, 2020. She also certified to the chief county assessor that the property's 2019 assessment was just and equal. In light of the remainder of her testimony, the court reasonably found incredible Feeney's self-serving testimony that the 2020 assessment was a revision and correction.

¶ 85　Because we have determined that Feeney did not revise and correct the 2019 valuation, we need not reach, as the circuit court did, the issue whether an assessor must limit herself to information that existed during the time frame that the Code sets forth for general assessments to be conducted. Feeney used data to make a January 1, 2020, valuation, not a valuation as of January 1, 2019, and she admitted that the 2019 assessment was correct.

¶ 86　Without citation to any authority, defendants next assert that an "objective" standard should be used to determine whether an assessment is incorrect. By "objective" standard, defendants evidently mean a standard that affords no deference to the assessor. We disagree that such a standard is appropriate here. First, defendants cite to no authority reflecting that this is the proper approach. Second, it is contrary to the evidence and law (where valuation is not at issue) that assessors have discretion in making assessments. *Cf. id.* § 23-15(b)(3) (in ruling on tax objections, the circuit court, in assessing a claim of incorrect valuation, "shall consider the objection without

regard to the correctness of any practice, procedure, or method of valuation followed by the assessor, board of appeals, or board of review in making or reviewing the assessment, and without regard to the intent or motivation of any assessing official"). Third, defendants point to no calculation errors. They merely challenge the use of certain estimates. We reject defendants' argument that the lack of actual data for some variables rendered Freese's valuation objectively incorrect. The assessor has discretion in determining assessments. As plaintiff notes, defendants' witnesses Paslawsky and Kinczel testified that an assessor properly uses estimates in her discretion. The valuation estimates are not subject to "correction"; corrections in the context of revisions and corrections involve physical misapprehensions and not estimates of value. Paslawsky testified that the term "revise and correct" means any changes in property characteristics or conditions. Gluekert testified that a correction remedies a material mistake in the assessment of the property itself, not to include value or a sale, and changes to the property include an expansion, additional square footage, or physical changes, not any changes to valuation.

¶ 87    As to Freese's estimates, the evidence reasonably reflected that they were matters within her discretion and the circuit court did not err in adopting them. Indeed, Feeney accepted Freese's income analysis. We reject defendants' argument that Freese lacked actual data to allow for reasonable estimates and that this reflects that her assessment was objectively incorrect. Specifically, they point to Kinczel's testimony that Freese's failure to parse out studio apartments from one-bedroom apartments was an omission and error. They also note his testimony that it was gross error for Freese to prescribe a $12,000 value to "other income." In contrast, they note, Feeney was able to determine the approximate number of parking spaces at the Atworth, as well as the monthly charges. She also had a full picture of the number and type of units and actual rental rates.

¶ 88 Even considering an objective standard, the court did not err in determining that the 2019 general assessment was not incorrect. We reject defendants' argument that Freese's income estimates were incorrect. Feeney accepted Freese's income analysis, including her rent and income data, testifying that the Atworth's 2019 valuation and assessment were fair. Defendants point to Feeney's analysis for 2020 to show that the 2019 analysis was incorrect. This is not relevant, as Feeney had (and used) data that was pertinent to her January 1, 2020, valuation. The circuit court reasonably discounted Kinczel's testimony that Freese's "other income" calculation was erroneous. Kinczel, as plaintiff notes, was not aware of the Atworth's rental rates or fees as of January 1, 2019. Nor did he know if fees for pets and garage spaces were waived or whether the property granted concessions for them or waived move-in fees, first month's rents, etc., as of January 1, 2019.

¶ 89 As to the capitalization rate, we also disagree with defendants that Freese used an incorrect rate that did not fit the property's characteristics. They note that the capitalization rate is inversely related to fair market value: a higher capitalization rate results in a lower fair market value and vice versa. An incorrect capitalization rate results in an incorrect fair market value and an incorrect assessment. Under the 2019 Board guidelines, defendants note, Freese's 7% capitalization rate fell within the local properties range, *i.e.*, mom-and-pop-type properties owned by private individuals. The Atworth, they contend, is not a local property. They assert that, using *de novo* review, this court may consider whether the rate is incorrect based on objective evidence. We reject this argument.

¶ 90 The circuit court did not err in determining that Freese's use of a 7% capitalization rate was not incorrect, where the guidelines are not mandatory and where assessors have discretion to deviate from the guidelines. Freese testified that the Atworth is an institutional property and that

she selected a 7% loaded capitalization rate, explaining that a loaded rate "loads," *i.e.*, includes, the tax rate. The capitalization rate was appropriate because (1) the building was just starting to lease and, thus, there was risk, and (2) interest rates had increased. Paulson, plaintiff's expert, also opined that the 40% expense ratio was appropriate in his experience because the property at that time had no track record, *i.e.*, no history of expenses. During a new-build phase, he explained, there are inefficiencies. Paulson also referenced a nationwide survey that reported, for the first quarter of 2019, the average capitalization rate for all apartments was 8.73%. This influenced his opinion that a 7% capitalization rate was appropriate. Also, the property was leasing up in 2019, which meant it had a great deal of risk; thus, Paulson did not consider the Atworth an institutional grade property as of January 1, 2019. He also reviewed the CoStar database, which showed capitalization rate ranges of 5% to 7%. Kinczel, defendants' expert, testified that institutional-grade buyers typically purchase turnkey properties and wait until *after* the lease-up phase to purchase. He also assumed Freese's capitalization rate was an unloaded capitalization rate. Capitalization rate is a measure of risk. He testified that there is more risk to an investor to purchase a luxury apartment complex that is 52% occupied versus 97% occupied.

¶ 91    Finally, we reject defendants' argument that the full assessment of the property in 2019 was incorrect and led to an underassessment in 2020. They contend that a partial valuation assessment should have been done. The undisputed evidence showed that the 2019 assessment was a full assessment. Indeed, the parties stipulated that Freese did not make a partial assessment in 2019. Further, the evidence showed that the 2020 assessment was not conducted to account for added value to the Atworth from additional buildings, structures, or other improvements, as the circuit court reasonably determined. Paulson testified that the property was substantially different

in 2020 as compared to 2019, but only "from an operating point of view." This does not mean, as plaintiff argues, that the January 1, 2019, assessment was incorrect.

¶ 92    In sum, the circuit court did not err in determining that the 2020 increased valuation was not statutorily authorized and, thus, the increases in 2020 and 2021 resulting from the revaluations were unauthorized and void.

¶ 93                    C. Whether the Board Exercised Its Statutory Judgment

¶ 94    Next, defendants argue that the Board inherently exercised its own judgment and made its own determination to correct the incorrect assessment. It notes that the Board has such authority under section 16-55(e) of the Code without regard to what the assessors might or could have done (and its exercise of its independent authority negates any alleged illegal action by the assessor). A confirmation of the assessor's valuation, they assert, can still be an independent determination of value. For the following reasons, we reject this argument.

¶ 95    Defendants point to the Board's hearings regarding the 2020 and 2021 assessments, after which it issued "No Change" rulings that deemed Feeney's valuations accurate and just valuations. Defendants note that the Board also considered plaintiff's argument that the 2020 change in assessment by Feeney was an illegal revaluation and found that the revision and correction was warranted. Paslawsky testified that the assessment change was a proper revision and correction based on the evidence that the Atworth "was not complete in 2018 or had been completed at the end of 2019"; thus, the property was not up to its value in 2019. Defendants urge that the Board did not blindly affirm the assessor's calculations, but considered the evidence and independently found that the assessor made a revision and correction and that the 2019 assessment was not just because, at the time, the property was not up to its value. The statute, they note, does not limit the

Board to only increasing or reducing the assessments as is just, but to do *anything* with respect to the assessment to make it a just assessment.

¶ 96    The circuit court found that, for the Board to change an assessment in a non-quadrennial year, a party must file a complaint with the Board, requesting that it change the valuation as may be just, or the Board, on its own motion, may reconsider an assessment. Further, notice must be given to the party to be affected of the nature of the hearing. The circuit court found that neither of these two conditions were met here. "[B]efore she unilaterally reassessed the Atworth and increased the Atworth's assessment for tax year 2020," the court found, Feeney never filed a complaint before the Board or in any way requested that the 2019 general assessment be increased. Further, the court noted that the Board has authority to change valuations for a just assessment without regard to the assessor's actions. However, if the assessor's action in changing an assessment is without authority, the court noted, it is void and the Board cannot, in affirming it, render it valid. Finally, the court rejected defendants' argument that the Board exercised its own judgment and increased the assessment for the 2020 tax year. It noted that Feeney never filed a complaint with the Board or asked it to increase the Atworth's assessment when plaintiff appealed the increase in the 2020 and 2021 assessments. Thus, the Board never exercised its judgment to raise the valuation.

¶ 97    Section 16-55(e) of the Code provides:

"The board may also, at any time before its revision of the assessments is completed in every year, *increase, reduce or otherwise adjust* the assessment of any property, making changes in the valuation as may be just, *and shall have full power over the assessment of any person and may do anything in regard thereto that it may deem necessary to make a just assessment*, but the property shall not be assessed at a higher percentage of fair cash

- 29 -

value than the assessed valuation of other property in the assessment district prior to equalization by the board or the Department." (Emphases added.) *Id.* § 16-55(e).

¶ 98 Here, the Board did not "increase, reduce, or otherwise adjust" the property's valuations or take any action to "make a just assessment." It issued "No Change" decisions, confirming the 2020 and 2021 assessed values.

¶ 99 Defendants assert that the fact that there was discussion and debate reflects that the Board exercised its discretion and made an independent valuation. They concede that this does not necessarily mean that the Board exercises discretion in *every* review or no change determination, but that it did so in this case and, under the statute, may make changes in the valuation that are necessary to a just assessment, regardless of what the assessor might or could have originally done. Here, they assert, the Board heard argument, provided reasons for its decision to reject plaintiff's argument that Feeney illegally revalued the Atworth, discussed their valuation positions, considered the evidence, and then came to an independent valuation that just happened to be the same value established by the assessor. The circuit court's determination that the Board merely affirmed a void increase and did not utilize its own judgment, defendants argue, is not supported by the record.

¶ 100 We reject defendants' argument. The Board engaged in discussion and debate, but defendants point to nothing in the record that convinces us that that the Board took any action to make the assessment "just" or that the circuit court's determination was erroneous. The hearing of argument, consideration of evidence, and discussion do not reflect anything above and beyond the mere confirmation of the assessor's determinations. Further, the record does not reflect that the Board determined that the property was not up to its fair value in 2019 and that the 2020 valuation proposed by the assessor was fair and just. See *People ex rel. Carr v. Keogh*, 306 Ill. 323, 325

(1922) (board's mere confirmation of the void action of the board of assessors did not show that the board exercised its judgment); see also *People ex rel. Carr v. Chicago Dock & Canal Co.*, 306 Ill. 399, 401 (1923) ("The action of the board of assessors was void, and the board of review cannot, by affirming such action, render it valid.").

¶ 101   In sum, the court did not err in determining that the Board did not exercise its discretion in rendering its no change determination.

¶ 102                                 D. Valuation

¶ 103   Defendants' final argument is that valuation is at issue in this case and that the case cannot be decided without determining the Atworth's value. They contend that the circuit court erred in determining otherwise. Defendants urge that the correctness of the 2020 and 2021 assessments presents an ultimate question before this court, *i.e.*, what are the correct valuations for each of those tax years. Further, they note that plaintiff's argument that the assessments were excessive necessarily raised the question of what the assessments should have been, *i.e.*, the correct valuations. Plaintiff, defendants assert, placed valuation before the Board when it asked for values lower than the assessor values. In the 2020 appeal, it argued that a reduction was warranted based on equity and market value, thus, the Board considered the market value of the property for 2020. Plaintiff, defendants further argue, cannot now claim that market value is not at issue. Defendants ask this court to determine that the market value of the Atworth was at issue and, under our inherent equitable authority, to rely on plaintiff's stipulation that the market value of the Atworth as of January 1, 2020, was $90.42 million.

¶ 104  Defendants argue that valuation was raised before the Board (raising market-based argument comparing sales prices and asking for a market value that was below the 2019

assessment), and, in reviewing the Board's actions, the circuit court erred in not considering valuation.

¶ 105   The circuit court found that no filings raised the issue of valuation. The court noted that a plaintiff is the master of its complaint and the only issues before it were the two issues raised by plaintiff in its complaint: (1) whether the 2020 and 2021 increased assessed value of the property was made without statutory authority and was, thus, illegal, and (2) whether the 2020 and 2021 increased assessed value of the property violated the uniformity clause because the assessments were not determined in the same manner as other similar properties in Libertyville Township. The circuit court found that plaintiff did not challenge the accuracy of the 2020 assessment. Although plaintiff utilized the term "incorrect," the court further determined that, read in context, it was clear that plaintiff only alleged that the valuation was "incorrect" because it was changed by the assessor without legal authority and not because of the incorrect use of data, calculation, or methodology. Regardless, the court continued, even assuming plaintiff challenged valuation before the Board, the issue was not automatically before the circuit court because the issues are formed by the pleadings and the court's review was *de novo*. "In this case, no paper or pleading raised the issue of whether the Assessor's 2020 and 2021 valuations were incorrect."

¶ 106   We conclude that the circuit court correctly assessed this issue. Section 23-15(a) of the Code provides that a tax objection complaint filed in the circuit court "shall specify any objections that the plaintiff may have to the taxes in question." 35 ILCS 200/23-15(a) (West 2022). Plaintiff raised two issues in its complaint, and valuation, as the circuit correct reasonably found, was not raised as an objection. See *Reed v. Wal-Mart Stores, Inc.*, 298 Ill. App. 3d 712, 718 (1998) ("[P]laintiffs are masters of their complaint and are entitled to proceed under whichever theory they decide, so long as the evidence supports such a theory."). Plaintiff's stipulation that the fair

market value of the Atworth as of December 30, 2019, was $90.42 million does not reflect that the issue of valuation was raised. The fact that an assessment was allegedly excessive does not raise a factual question of the correct valuation. Further, plaintiff did not raise the issue of valuation before the Board, where it did not submit income and expense data to support its case before the Board and where its commercial appeal forms in 2020 and 2021 do not reflect that plaintiff made a valuation appeal to the Board. Finally, it did not raise valuation in its memorandum of law submitted to the Board in its 2020 and 2021 appeals.

¶ 107    In sum, the circuit court did not err in determining that valuation was not at issue.

¶ 108                                    III. CONCLUSION

¶ 109    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 110    Affirmed.

*Passco Mellody Farm DST Trust v. Kim*, 2025 IL App (2d) 240329

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, Nos. 21-TX-26, 22-TX-671; the Hon. Luis A. Berrones, Judge, presiding. |
| **Attorneys for Appellant:** | Mallory A. Milluzzi and Scott E. Nemanich, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant Village of Vernon Hills. No brief filed for other appellant. |
| **Attorneys for Appellee:** | Kevin R. Malloy, of Holland Hicks Law LLC, and Paul J. Reilly, Mark Volpe, and Kaitlin McKenzie, of Reilly & Dooley, LLC, both of Chicago, for appellee. |